JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Phillip Simpson appeals his convictions for drug possession, drug trafficking, and possession of criminal tools. Simpson assigns the following errors for our review:
 "I. Phillip Simpson was denied his constitutional right to a fair and impartial jury by the repeated introduction of prejudicial other acts evidence."
 "II. Phillip Simpson was deprived of his constitutional right to a fair trial before a jury of his peers by the trial court's improper jury instructions."
 "III. Phillip Simpson was deprived of his constitutional right to effective assistance of counsel, by trial counsel's failure to represent Mr. Simpson zealously."
 {¶ 2} Having reviewed the record and pertinent law, we affirm Simpson's conviction. The apposite facts follow.
 {¶ 3} On April 6, 2006, the Cuyahoga County Grand Jury returned a multi-count indictment against Simpson and his co-defendant, Barry Blevins, alleging violation of various drug laws. Five counts applied to Blevins and are not part of this appeal.
 {¶ 4} The remaining counts, applying to Simpson, included five counts of drug trafficking, four counts of drug possession, one of which contained a major drug offender specification and a juvenile specification. The grand jury also indicted Simpson on one count of possessing of criminal tools. On November 7, 2006, a jury trial commenced.
 Jury Trial {¶ 5} At trial, the State presented the testimony of nine witnesses, including the testimony of a confidential reliable informant identified only as "Jason." Jason testified that *Page 3 
he has been convicted of domestic violence and theft. Jason stated he is a recovering addict, who has abused drugs for more than twelve years.
 {¶ 6} Jason testified that sometime in January 2006, he arranged to meet Simpson, who he knew only as "Sunshine," at a White Castle restaurant to purchase crack cocaine. Jason testified that he had met with Simpson on previous occasions to purchase crack cocaine. Jason stated that on this occassion, before he could make the purchase, officers from the Cleveland Police Department apprehended him. Jason stated that after speaking with Detectives Scott Moran and Tom Klamert, he decided to become an informant and began making controlled drug buys for the police department.
 {¶ 7} Jason testified that on February 6, 2006, he arranged a controlled drug buy with Simpson. Jason met with Detectives Moran and Klamert before proceeding to the prearranged meeting place and was given money to purchase the drugs. Jason drove to the location with the police following closely behind him.
 {¶ 8} Jason testified that once he arrived at the appointed place, Simpson called his cell phone. During the call, Simpson instructed him to exit the truck, take off his jacket, take off his cap, and walk around the truck, making sure his hands were visible. Jason stated that initially, he could not see Simpson until he was instructed to walk around to the side of the building, where Simpson was hiding behind a fence.
 {¶ 9} Jason testified that Simpson instructed him to approach the fence, stretch out his hands and take off certain articles of clothing, so that Simpson could determine if he was *Page 4 
wearing a wire. Jason then exchanged the buy money for the crack cocaine. Jason returned to the police officer and gave them the suspected crack cocaine.
 {¶ 10} Jason testified that on February 8, 2006, he met with Detectives Moran and Klamert, who directed him to arrange another control drug buy with Simpson. Jason called Simpson and arranged to purchase more crack cocaine. Before proceeding to the appointed location, the police fitted Jason with a miniature microphone.
 {¶ 11} Jason testified that as he proceeded to the agreed upon location, Simpson called and instructed him to go to a different location. When he got to the next location, Simpson called and instructed him to go to a different location. In the end, Jason and Simpson failed to meet that day.
 {¶ 12} Jason testified that on February 14, 2006, he met with Detectives Moran and Klamert, who again instructed him to call Simpson to arrange a controlled drug buy. Jason called Simpson, who arranged to meet with him, but never did.
 {¶ 13} Simpson's co-defendant, Blevins, testified that he has been convicted of receiving stolen property, was given probation, but served six months in jail after violating probation. Blevins testified that the grand jury indicted him with a major drug offender specification, which carried a mandatory ten-year prison term. Blevins stated that he agreed to cooperate with the State by testifying, and in exchange, he pleaded guilty to two second degree felonies, which carried possible sentences of two to eight years in prison. *Page 5 
 {¶ 14} Blevins testified that he has known Simpson for approximately three or four years, but only knew him by "Munchie." Blevins stated that both he and Simpson sold crack cocaine. Blevins stated that he and Simpson spent a lot of time together, and while together, would receive calls from their respective drug customers. Blevins stated that when he could not reach his supplier, he would borrow crack cocaine from Simpson to sell to his own customers.
 {¶ 15} Blevins testified that on January 21, 2006, he sold sixty dollars worth of crack to one of his customer's named Patty. Blevins stated that on January 28, 2006, Patty called and wanted to purchase nine hundred dollars worth of crack cocaine. Blevins stated he did not have that much crack cocaine, but agreed to the sale, and arranged to meet Patty at a White Castle restaurant.
 {¶ 16} Blevins testified that Simpson drove him to the White Castle restaurant, but when he arrived he did not see Patty. Blevins stated that he asked Simpson to drive around the block and drop him off. Blevins walked back to the restaurant, where he saw Patty waiting. Blevins stated that as he approached Patty, she began acting suspicious, and he saw the police arriving. Blevins fled the scene on foot as Patty was surrendering to the police.
 {¶ 17} Blevins testified that on February 17, 2006, Simpson picked him up from home and the two proceeded to drive around the neighborhood. Blevins stated that as they were driving around, he saw a traffic cop that he knew, and Simpson pulled into the housing project where Simpson lived. *Page 6 
 {¶ 18} Blevins testified that he and Simpson waited in the driveway of the housing project, but Simpson received a phone call from a customer and proceeded out of the housing project. Blevins stated that as they were en route to the customer, a police car pulled behind them, started following, and initiated a traffic stop.
 {¶ 19} Blevins testified that Simpson stopped the car and proceeded to run. Blevins stated that before Simpson ran, he had a sandwich bag containing crack cocaine in an amount the size of a lemon, which he placed in the pouch of his hooded sweatshirt. He also stated that he had crack cocaine in his pants pocket, so he too decided to run. The police gave chase and eventually apprehended both Blevins and Simpson. Blevins stated that before he was apprehended, he hid his crack cocaine between his buttocks.
 {¶ 20} Blevins testified that after he was apprehended, the police asked if he was "Cody." Blevins initially denied being "Cody," but later admitted it was him, and stated that after he was arrested, the police showed him a big bag of crack cocaine, which they insisted belonged to him. Blevins denied that the crack cocaine was his.
 {¶ 21} Detective Klamert testified that on January 21, 2006, he and his partner Detective Moran, with the help of Patty, an informant, effected a controlled drug buy from an individual known only as "Cody." The detectives later learned that "Cody" was Blevins. Detective Klamert stated that on January 28, 2006, with the help of Patty, they arranged a nine hundred dollar purchase of crack cocaine from Blevins. *Page 7 
 {¶ 22} Detective Klamert testified that they followed Patty to a White Castle restaurant, the appointed meeting place. Detective Klamert stated that while waiting for Cody to arrive, the surveillance officers indicated that they saw a red Chevrolet Lumina, with two black males circling the area near the restaurant. Detective Klamert stated that after a short while, Blevins approached the restaurant on foot, spoke to Patty, but fled after he saw the police. Detective Klamert stated that the surveillance officers followed the red Chevrolet Lumina, which turned down a cul-de-sac. Detective Klamert stated that he also followed the red Chevrolet Lumina.
 {¶ 23} Detective Klamert testified that the driver, whom he recognized as Simpson, jumped out of the car while it was still running, causing it to crash into a guardrail. Detective Klamert stated that Simpson fled, but he never pursued him because he had Patty with him and did not want to compromise her identity.
 {¶ 24} Detective Klamert testified that he found a cellular phone near where the car had stopped. The phone rang, the caller asked for Sunshine, and Detective Klamert pretended to be Sunshine. As a result of the conversation, Detective Klamert agreed to meet the caller in twenty minutes at the White Castle restaurant. Detective Klamert met with the caller, who turned out to be Jason. After their discussion, Jason agreed to be a confidential reliable informant for the police.
 {¶ 25} Detective Klamert testified that after Jason agreed to be an informant, Simpson became the target of their investigation, and Jason began making controlled telephone calls to *Page 8 
arrange controlled drug buys. Detective Klamert testified in conformity with Jason's testimony regarding the controlled drug buys that were completed or attempted with Simpson. Detective Klamert testified that as a result of the controlled drug buys effected between Jason and Simpson, the police department obtained an arrest warrant for Simpson and a search warrant for his residence.
 {¶ 26} Detective Klamert testified that on February 17, 2006, while he and Detective Moran were scouring the area looking for Simpson, they saw him driving a light blue Lincoln Town Car, which later pulled into a driveway at 4238 West 121 Street. Detective Klamert stated that Simpson exited the vehicle in the company of two other individuals, and all three entered the house.
 {¶ 27} Detective Klamert testified that the police set up surveillance about a block from the house. A short while later, the Lincoln Town Car exited the driveway. A patrol car immediately got behind it and began following. After a few turns, the driver pulled into a driveway, two individuals exited the car and began to run.
 {¶ 28} Detective Klamert testified that both men were apprehended a few minutes later. Detective Klamert stated that he found one of the men, who he immediately recognized as Simpson, hiding underneath the deck of a house. Simpson refused to come from under the deck and the police had to employ a taser gun to effect his surrender.
 {¶ 29} Detective Klamert testified that the police recovered a small amount of cocaine in the car and from Blevins' jacket. Detective Klamert stated that when the search warrant *Page 9 
was executed, the police recovered approximately 597 grams of crack cocaine. The officers also found small plastic baggies containing cocaine residue scattered throughout the house. In addition, the officers found a scale containing cocaine residue in the bedroom believed to be Simpson's.
 {¶ 30} Detective Klamert stated that when Simpson was questioned about the drugs found at the house, he initially denied that the drugs belonged to him. Simpson only admitted the drugs belonged to him after being advised that an arrest warrant would be issued for his younger brother, in whose room the drugs were discovered. Detective Klamert testified that Simpson indicated that only half the drugs belonged to him and the other half to Blevins. Detective Klamert stated that Blevins denied that any of the drugs found at the house belonged to him.
 {¶ 31} At trial, the State played the recorded telephone calls Jason made to Simpson to arrange the controlled drug buys. The State also played a portion of a video tape, which Detective Klamert found in the car Simpson was driving the day he eluded capture. The video tape depicted 4238 West 121st Street, the property, where the search warrant was executed. In the video, Simpson is depicted waking up from a nap. In addition, the video depicted Simpson in his car engaging in a drug transaction on a street in Cleveland.
 {¶ 32} At trial, the Court recalled Blevins to the stand. After testifying, Blevins informed Detective Klamert that he had perjured himself. When Blevins was recalled to the stand, Blevins stated he had lied when he testified that on February 17, 2006, after seeing the *Page 10 
police, he and Simpson sat in the car in the driveway. Blevins stated that he had entered the house, stayed there for about ten minutes, and when Simpson received the phone call from a customer, they both left. Blevins stated that he lied because he believed he would be in more trouble if he admitted being in a house where such a large quantity of drugs were found.
 {¶ 33} Simpson's sister, Channell Garrett, testified for the defense. Garrett testified that Simpson lives with her and her children in Shaker Heights, Ohio. Garrett stated that on February 17, 2006, she was visiting her mother at 4238 West 121st Street, when she encountered Blevins coming upstairs. Garrett stated she had a brief conversation with Blevins, who was carrying the bag, which the police found while executing the search warrant.
 {¶ 34} The jury found Simpson guilty of all counts except two fifth degree drug trafficking charges. The trial court sentenced Simpson to the mandatory ten-year prison term for the major drug offender and juvenile specifications, and to one-year prison terms for each of the remaining charges. The trial court ordered the sentences to be served concurrently.
 Other Acts {¶ 35} In the first assigned error, Simpson argues he was denied a fair trial by the repeated introduction of other acts evidence. We disagree.
 {¶ 36} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.[1] Accordingly, we proceed under an abuse of discretion *Page 11 
standard. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.[2]
 {¶ 37} Evid. R. 404(B) provides:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 38} Further, the prior act must not be too remote and must be closely related in nature, time, and place to the offense charged.[3]
A prior act which is "* * * too distant in time or too removed in method or type has no permissible probative value."[4]
 {¶ 39} In the instant case, Simpson argues that Jason's testimony regarding prior drug transactions with him should not have been admitted. We are not persuaded.
 {¶ 40} Here, Jason's claim that he previously bought drugs from Simpson, is not unfairly prejudicial, confusing or misleading. Notably, the present case involved a completed transaction that was watched from afar by the police and two other arranged, but *Page 12 
unconsummated transactions. The completed transaction and the two attempted transactions were all recorded by the police. Such fact diminishes the effect of the disclosure of the existence of previous drug sales between Jason and Simpson.
 {¶ 41} The recorded telephone calls also establish that a prior relationship existed between Jason and Simpson as buyer and seller. As a result, other acts evidence was already implied in a non-contested and acceptable manner. In addition, testimony on past deals tends to show intent.[5] Mention of prior transactions also tends to show identity as repeated contact with defendant in past sales bolsters the informant's identification of defendant and discounts any suggestion of misidentification.[6]
 {¶ 42} Further, interactions in the near past in similar and identical situations may tend to show a scheme, plan, or system.[7] Such evidence is permissible where it is offered to show how Jason knew Simpson or Simpson's mode of operation. That is, Jason would purchase the drugs through an arranged meeting with Simpson over the telephone.[8] *Page 13 
 {¶ 43} Within this assigned error, Simpson argues that Blevins' testimony that he and Simpson sold drugs together, that Simpson drove him to meet Patty, and that he would borrow drugs from Simpson when he could not reach his supplier, should not have been admitted. We are not persuaded.
 {¶ 44} Upon review, Blevins' statements are highly probative in proving a course of Simpson's conduct contemporaneously and inextricably linked to the current charges. Blevins' testimony that Simpson drove him to meet Patty was independently verified by Detective Klamert, who testified that he recognized Simpson, but decided against pursuing him for fear of compromising Patty's identity. Thus, the probative value of this testimony was not substantially outweighed by the danger of unfair prejudice to Simpson.
 {¶ 45} We also find that Blevins' testimony that he spent a lot of time with Simpson, where they both fielded telephone calls from their respective drug customers, and that he often borrowed crack from Simpson to sell to his own customers, was probative in establishing the context of their relationship. However, it is questionable how much the jury relied on this testimony in light of Blevins admitting that he had perjured himself. Notwithstanding, the testimony tends to show intent, knowledge, opportunity and identity. Thus, the admission of this contested testimony was not outweighed by the danger of undue prejudice. *Page 14 
 {¶ 46} Finally, within this assigned error, Simpson argues the video tape depicting him engaging in, among other things, a drug transaction should not have been admitted. We are not persuaded.
 {¶ 47} A review of the record indicates that the video tape depicts the interior of the house where the search warrant was executed. It pans the kitchen area to the outside where Simpson's car is parked in the driveway. The video also depicts Simpson driving the car, stopping, and then making an exchange with someone at the driver's window. Additionally, the video depicts, Simpson sleeping on the couch, awakening when his phone rings, and proceeding to answer the call.
 {¶ 48} At trial, after a hearing, the trial court overruled Simpson's motion to exclude the playing of the video tape. The trial court ruled that the video was corroborative of previous testimony and not overwhelmingly prejudicial. The trial court ruled that the video would be played without sound.
 {¶ 49} Our review of the record indicates that the introduction of the video taped evidence was cumulative. The jury heard an audio tape, where Simpson had been identified by a witness engaging in a drug transaction. In addition, the jury heard audio tapes of Simpson and Jason arranging via telephone to meet for the purpose of conducting a drug transaction. Further, the jury heard testimony that Simpson provided a written statement admitting ownership of at least half of the drugs found at the house.
 {¶ 50} Simpson's written statement provides in pertinent part as follows: *Page 15 
 "Q. Who did the drugs found in your house belong to?
 A. Me and Barry.
 Q. Who is Barry?
 A. Just a friend. We just kick it, I met him when we played basketball and I won a bet against him.
 Q. Is your friend Barry the same person that was arrested with you that I know as Barry Blevins?
 A. Ya.
 Q. How much cocaine was found at your house?
 A. I don't know.
 Q. When did you get the cocaine?
 A. Barry got it yesterday or today, or two days ago.
 Q. How did it get into your house?
 A. He brought it.
 Q. How much of it was yours?
 A. Half of it, I don't know how much of it was in there.
 Q. How much did you pay for it?
 A. I gave Barry twenty five hundred.
 "* * *
 Q. And you guys were going to split that dope?
 A. Yes. *Page 16 
 Q. Have you guys ever bought dope before?
 A. No, this was the first time.
 Q. Who's house is at 4238 W. 121 Street?
 A. My mother.
 Q. Who else lives there?
 A. Me and my brother and little sisters and my mom."[9]
 {¶ 51} We conclude on the record before us that the State had presented overwhelming evidence to convict Simpson without the introduction of the video tape. The video tape was merely cumulative and served to corroborate prior witness testimonies. Further, the trial court gave the jury a detailed limiting instruction regarding the video tape. As such, the trial court's decision to admit the other acts evidence complained of, did not amount to an abuse of discretion. Accordingly, we overrule the first assigned error.
 Jury Instruction {¶ 52} In the second assigned error, Simpson argues the trial court erred by failing to give a specific unanimity instruction. We disagree.
 {¶ 53} Crim. R. 30(A) states:
 "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies of such requests shall be furnished to all other parties at the time of making such requests. The court shall inform counsel of its proposed action upon the requests prior to their *Page 17 
arguments to the jury, but the court shall instruct the jury after the arguments are completed. The court need not reduce its instructions to writing.
 A party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
 {¶ 54} A failure to object before the jury retires in accordance with the second paragraph of Crim. R. 30(A), absent plain error, constitutes a waiver.[10]
 {¶ 55} Defense counsel did not object to the instruction given to the jury; therefore, the failure to include an augmented unanimity instruction would have to amount to plain error. A defective jury instruction does not rise to the level of plain error unless it is clear that the outcome of the trial would have been different absent the error.[11] Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.[12]
 {¶ 56} Simpson cites State v. Johnson[13] to support his argument that the jury should have received an augmented instruction on unanimity. In Johnson, supra, the court stated that if a single count can be divided into two or more distinct conceptual groupings, a jury *Page 18 
shall be instructed that it must unanimously conclude that a defendant committed acts falling within a specific grouping. In this case, we do not have a single count. Simpson was indicted on multiple counts of drug possession and drug trafficking under separate sections of the statute. Therefore, Johnson does not apply.
 {¶ 57} We have previously said that a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction even where the indictment alleges numerous factual bases for conviction.[14] Further, it is presumed that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged."[15]
 {¶ 58} The trial court gave a general unanimity instruction to the jury. The jury was instructed that each count in the indictment constituted a separate and distinct matter and that it must consider each count and evidence applicable to each count separate from all other counts. Therefore, the jury was instructed on each individual theory of drug possession, drug trafficking and possession of criminal tools.
 {¶ 59} We find that the evidence was sufficient to find Simpson guilty of drug possession, drug trafficking and possession of criminal tools under any of the applicable code *Page 19 
sections and the trial court did not err by failing to give separate instructions. Moreover, there is absolutely no evidence that the jury did not decide with unanimity. The jurors individually signed verdict forms for each count of the indictment and the trial court polled each juror in open court after the verdict was returned.
 {¶ 60} We find no plain error. The outcome of the trial would not have been different if the jury had been instructed differently, nor was the court under any obligation to give the jury a different unanimity instruction. Accordingly, we overrule the second assigned error.
 Ineffective Assistance of Counsel {¶ 61} In the third assigned error, Simpson argues he was denied the effective assistance of counsel. We disagree.
 {¶ 62} We review a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington.[16] UnderStrickland, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance.[17] To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would *Page 20 
have been different.[18] Judicial scrutiny of a lawyer's performance must be highly deferential.[19]
 {¶ 63} In the instant case, Simpson argues that trial counsel was ineffective for failing to request a specific unanimity jury instruction. In the second assigned error, we concluded that the outcome of the trial would not have been different had trial counsel requested a specific unanimity jury instruction. Consequently, Simpson was not prejudiced by trial counsel's failure to request a specific unanimity jury instruction.
 {¶ 64} Within this assigned error, Simpson also argues that trial counsel was ineffective by failing to zealously object to the introduction of the other acts evidence. In the first assigned error, we concluded that the State presented sufficient evidence of Simpson's guilt, despite the introduction of the other acts evidence. In addition, despite Simpson's assertions to the contrary, the record indicates that trial counsel vigorously argued to keep the contested other acts evidence from being introduced.
 {¶ 65} We conclude on the record before us that the outcome of the trial would not have been different despite the alleged deficiencies. Thus, Simpson was not denied the effective assistance of counsel. Accordingly, we overrule the third assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed. *Page 21 
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., and MELODY J. STEWART, J., CONCUR
[1] State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus; State v. Bailey (1992), 83 Ohio App.3d 749.
[2] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[3] State v. Ayers, 5thDist. No. 06-CA-01,2006-Ohio-5533, citing State v. Schaim, 65 Ohio St.3d 51, 60,1992-Ohio-31.
[4] State v. Snowden (1976), 49 Ohio App.2d 7, 10; State v.Burson (1974), 38 Ohio St.2d 157, 159.
[5] State v. Simmons, 7th Dist. No. 06JE4, 2007-Ohio-1570, citingState v. Cruz (Oct. 28, 1993), Cuyahoga App. No. 64007.
[6] Id., citing State v. McNeill (Apr. 1, 1997), 9th Dist. No. 95CA006158; State v. Greene (May 15, 1996), 4th Dist. No. 94CA2297;Cruz, Cuyahoga App. No. 64007; State v. Velez (Dec. 18, 1992), 3d Dist. No. 4-92-11; United States v. Evans (C.A.5, 1988), 848 F.2d 1352,1360.
[7] State v. Jones, 7th Dist. No. 06 MA 17,2007-Ohio-7200.
[8] See State v. Lumbus, Cuyahoga App. No. 87767, 2007-Ohio-74.
[9] State's Exhibit 23 / Simpson's Statement.
[10] State v. Williford (1990), 49 Ohio St.3d 247, 251.
[11] State v. Campbell (1994), 69 Ohio St.3d 38, 1994-Ohio-492;State v. Blair (July 6, 2000), Cuyahoga App. No. 76511.
[12] State v. Phillips, 74 Ohio St.3d 72, 83, 1995-Ohio-171.
[13] (1989), 46 Ohio St.3d 96, (overruled by State ex rel. Steckman v.Jackson (1994), 70 Ohio St.3d 420.)
[14] State v. Hamad, Cuyahoga App. No. 81189, 2003-Ohio-4401;State v. Thompson, Cuyahoga App. No. 85843, 2006-Ohio-3162; andState v. Burgan, Cuyahoga App. No. 86176, 2006-Ohio-812.
[15] Id., quoting Turner v. United States (1970), 396 U.S. 398, 420,24 L. Ed.2d 610, 90 S.Ct. 642.
[16] (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052.
[17] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of syllabus.
[18] Id. at paragraph two of syllabus.
[19] State v. Sallie (1998), 81 Ohio St.3d 673, 674. *Page 1