[Cite as *State v. Jackson*, 2025-Ohio-109.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 113594 |
| v. | : | |
| DUANE JACKSON, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 16, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672546-B

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carson M. Strang and Jeffrey S. Schnatter, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} This appeal involves a drive by shooting that resulted in the death of a 13-year-old male ("victim") in Euclid, Ohio. Defendant-appellant, Duane Jackson ("Jackson"), appeals his convictions and sentence for felony murder, felonious

assault, improperly discharging into habitation, discharge of a firearm on or near prohibited premises, and tampering with evidence with the accompanying firearm specifications. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} On July 25, 2022, Jackson was indicted along with his codefendant, Leroy Billips ("Billips"). They were each charged with the following offenses:

• Count 1: aggravated murder, a felony of an unspecified degree, in violation of R.C. 2903.01(A), with one-, three-, and five-year firearm specifications.

• Count 2: murder, a felony of an unspecified degree in violation of R.C. 2903.02(A), with one-, three-, and five-year firearm specifications.

• Count 3: murder, a felony of an unspecified degree in violation of R.C. 2903.02(B), with one-, three-, and five-year firearm specifications. [felony murder].

• Count 4: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), with one-, three-, and five-year firearm specifications.

• Count 5: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2), with one-, three-, and five-year firearm specifications.

• Count 6: improperly discharging into habitation, a felony of the second degree, in violation of R.C. 2923.161(A)(1), with one-, three-, and five-year firearm specifications.

• Count 7: discharge of firearm on or near prohibited premises, a felony of the first degree in violation of R.C. 2923.162(A)(3), with one-, three- , and five-year firearm specifications.

• Count 8: tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1). [1]

• Count 10: tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1).

{¶ 3} On October 23, 2023, a joint jury trial began for Jackson and Billips, at which the following evidence was adduced.

{¶ 4} On December 11, 2021, Jessica Adams ("Adams") was at home with her five-year-old son and her mother located on Zeman Avenue in Euclid, Ohio, when the victim knocked on her front door asking for Adams's daughter. She informed the victim that her daughter was not home. Adams shut the door and within seconds, Adams heard multiple gunshots. She grabbed her son from the couch, yanked him to the floor, and called 911. The 911 call came in at 2:38 p.m.

{¶ 5} Within minutes, Euclid police were on scene and observed the victim lying lifeless on the ground in Adams's driveway. Officer David Maslyk ("Officer Maslyk") observed a gunshot wound to the victim's upper chest under the armpit, as well as several 9 mm shell casings and defects in the grass near the victim's bicycle that appeared to be bullet impacts. Inside Adams's home, Officer Maslyk observed bullet defects through the front windows, the couch where the five-year-old was sitting, and the refrigerator. There were no witnesses to the shooting; however, Adams's Ring doorbell camera captured the entire incident on video.

---

[1] Count 9 charged Billips with tampering with evidence. *See State v. Billips*, 8th Dist. Cuyahoga No. 113663.

{¶ 6} The video, which was played for the jury, depicts the victim approaching Adams's house on his bicycle, laying his bike in the front yard, looking around, and then walking up to the front door and knocking. The victim asked for his friend. He then leaves the front porch and heads towards his bicycle. At the same time, a black SUV can be observed slowly driving past the house while multiple gunshots are fired from the front passenger window. The Ring camera shows the victim running away from the SUV towards the driveway. The victim was struck by two bullets: one in the chest that exited his neck, and one in the buttocks. The coroner later determined the cause of death was the gunshot wound to the chest and ruled the death a homicide.

{¶ 7} Detective David Carpenter ("Det. Carpenter"), of the Euclid police department, determined from the Ring camera video that the black SUV was an early to mid-2000s Ford Escape with two distinctive white straps hanging from the back of the vehicle. He testified that the passenger window was down when the seven to eight shots were fired. Det. Carpenter received surveillance video from a Sunoco gas station near the crime scene that showed the black SUV pulling into the parking lot at approximately 2:32 p.m. The vehicle pulled up to one of the gas pumps, sat at the gas pump for "maybe a minute or so," and then drove off. (Tr. 1037.) No one is seen getting in or out of the vehicle at that time. The SUV pulled out of the gas station approximately three minutes before the homicide occurred and traveled directly from the gas station to the scene of the shooting. Additionally, Det. Carpenter testified that police had a traffic-camera photo of the SUV after the

shooting that showed the vehicle traveling towards the entrance ramp of Interstate 90 going westbound towards the City of Cleveland.

{¶ 8} Euclid Detective Michael Caruso ("Det. Caruso") testified that he obtained a license plate number on the SUV by observing camera footage from a nearby street camera that was taken minutes before the shooting occurred. The SUV was registered to Jackson's mother, Traci Daniel. Jackson's mother testified that her son regularly drove her Ford Escape and confirmed that the SUV could be identified by the white straps hanging from the back. She further testified that Jackson's leg was injured around the time of the shooting and, though he had access to her vehicle, Jackson was not driving because his foot was in a boot. She also testified that Jackson was the only person who used her vehicle, and he had access it on the day of the murder.

{¶ 9} Jackson reported the SUV stolen to the Cleveland Police Department on the day of the murder. He claimed that it was stolen at gunpoint by two masked men near East 76 Street and Union Avenue in Cleveland sometime between noon and 12:30 p.m. Police determined, however, that the SUV was parked near Jackson's residence less than an hour after the claimed carjacking. The police also determined through traffic cameras that the SUV was seen traveling towards the area of the homicide shortly before it occurred, and the vehicle was not seen in the area where Jackson reported he had been carjacked.

{¶ 10} Two days after the shooting, Det. Caruso received an image of the SUV, and it was parked approximately 1,800 feet from Jackson's residence.

Detectives responded to where the SUV was parked and noted that the license plate had been removed from the vehicle. The police impounded the car.

{¶ 11} Det. Caruso interviewed Jackson on December 16, 2021, five days after the shooting. Jackson claimed that on the date of the homicide he was carjacked by two masked men with guns while he was buying weed on Union Avenue in Cleveland. He asserted that he has never been in the City of Euclid, except for football games, and does not know anyone who lives there. Jackson told the detective that after he was carjacked, he called his friend, "Mango," at about 1:00 p.m. to pick him up. He advised the detective that he did not know about the murder and took no part in it. Jackson admitted that he is the only one that drives the SUV, and he does not let anyone borrow it. Jackson voluntarily relinquished his cell phone, which police took into evidence.

{¶ 12} On Jackson's cell phone, Det. Caruso located a series of photographs taken in Jackson's driveway on the day of the homicide. The photos showed Jackson with Billips, and another minor, "J.S." In the photos, Jackson had what appears to be a handgun with an extended magazine in his waistband. The metadata associated with the series of photographs indicated that they were taken between 3:35 p.m. and 3:39 p.m. on December 11, 2021, approximately one hour after the homicide and three hours after Jackson claimed he was carjacked. The photos depict Jackson wearing a single dark-colored glove on his right hand and a ski mask. In one of the photographs Jackson is seated in the front passenger seat of the SUV. In some of

the photos, Billips is wearing a hooded sweatshirt and a ski mask and is holding a blue cell phone. The call to "Mango" was determined to be at 3:23 p.m.

{¶ 13} On February 1, 2021, Det. Caruso executed a search warrant at Billips's residence, where he seized a blue cell phone matching the one in the cell phone pictures found on Jackson's phone. Police also seized a 9 mm bullet and a .40 caliber handgun.

{¶ 14} Cell phone data placed Billips, Jackson, and J.S. at the scene of the homicide. FBI Special Agent Brian Lacy ("Agent Lacy") testified he is a member of the cellular analysis survey team that tracks historical cell site locations, which allows him to use cell phone records to estimate where a phone is located at a particular time. Agent Lacy cross-referenced times and locations when the SUV involved in this incident was scanned by license plate readers with the locations of the three suspects' cell phones. He testified that he was able to locate all three cell phones together in the same location as the SUV. Agent Lacy testified that all three cell phones moved simultaneously from the area of Jackson's home in Cleveland prior to the murder, through Little Italy, into the city of Euclid, and then back to Billips's residence in Cleveland after the time of the murder. He testified that between 2:34 p.m. and 2:38 p.m., all three cell phones were in the area of the shooting. In fact, Agent Lacy testified that at 2:35:55 p.m. and 2:36:27 p.m., Jackson's phone was mapped using arcs, and they overlapped the crime scene, which further supports Jackson's involvement.

{¶ 15} Crime analyst Matthew Seabold confirmed the FBI's findings. Using specialized software, Seabold created a map of where the three cell phones traveled during the time surrounding the shooting. Starting at 12:57 p.m. and ending at 3:16 p.m. the phones of all three suspects traveled from the area of Jackson's house to the area of the shooting, and then to the area where Billips lived.

{¶ 16} Det. Caruso testified that he interviewed Billips. During the interview the detective observed numerous tattoos on Billips, including one that said, "J[.L.] on my Heart." Police were familiar with a homicide victim named J.L., a middle schooler who was killed in a November 2020 shooting, near Adams's house on Zeman Avenue. Shortly after J.L.'s death, his mother called police expressing her belief that Adams's son, Andre Wilson ("Wilson"), was directly involved in her son's death. While investigating J.L.'s death, the police discovered that Wilson was with J.L. when he was shot, and they were in possession of a stolen firearm that they were looking to sell on the streets. Police learned that people suspected that Wilson set J.L. up to be robbed and the robbery resulted in his death.

{¶ 17} During Billips's interview, Billips admitted he knew Jackson from football but claimed he had not spoken to Jackson in a long time and had not ridden in Jackson's Escape since 2020. Billips denied knowing anything about victim's death. He also denied knowing the victim or Wilson. Billips admitted to knowing J.L., whose obituary listed Billips as a "special friend." When police looked at Billips's cell phone they discovered a series of rap lyrics that discussed committing a drive-by shooting to avenge J.L.'s death.

**{¶ 18}** Finally, Billips told police about an incident at Euclid High School that occurred after J.L. was murdered where a large fight broke out and during which Wilson fired a handgun in the air to escape the melee. Both Billips and Adams told police that Wilson was being attacked during the fight.

**{¶ 19}** DNA was collected from the SUV and analyzed. The analysis revealed that Billips was the main contributor of DNA found on the gearshift and an armrest, while Jackson was excluded as a contributor. And Jackson was the main contributor of DNA found on the front passenger's side head and seat cover, while Billips's was excluded.

**{¶ 20}** At the time of the shooting, the victim was living with Jordin Jackson ("Jordin"). Jordin testified that a few weeks prior to the shooting the victim told Jordin that he was fearful because a black truck was following him and shooting at him.

**{¶ 21}** After the conclusion of the trial, the jury convicted Jackson of Counts 3-7, with the accompanying one- and three-year firearm specifications, as well as Count 10 as charged. The jury acquitted Jackson of Count 1 and was unable to reach a verdict as to Count 2, and all of the five-year-drive-by specifications. By agreement of the parties, the trial court dismissed Count 2 and the five-year drive-by specifications. Jackson was sentenced to 32-years to life in prison. Jackson now appeals and raises the following assignments of error for review:

> **Assignment of Error I:** The trial court erred when it denied [Jackson's] motion for acquittal under Crim.R. 29 because the State

failed to present sufficient evidence to establish the elements necessary to support the convictions beyond a reasonable doubt.

**Assignment of Error II:**  [Jackson's] convictions are against the manifest weight of the evidence.

**Assignment of Error III:**  The court erred by denying [Jackson's] request for a standard jury instruction pursuant to OJI 409.15, which violated [Jackson's] constitutional right to Confrontation where a non-testifying codefendant's statement was introduced without the instruction.

**Assignment of Error IV:**  [Jackson] was deprived of his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Art. I, §10 of the Ohio Constitution.

**Assignment of Error V:**  The court erred by allowing the State to elicit inadmissible hearsay testimony over defense objection and depriving appellant of due process and a fair trial in violation of his federal and state constitutional rights.

**Assignment of Error VI:**  [Jackson] was denied a fair trial due to cumulative errors.

**Assignment of Error VII:**  [Jackson's] sentence is contrary to law because the record does not support the imposition of consecutive sentences.

{¶ 22} For ease of discussion, the assignments of error will be discussed out of order and together when appropriate.

## II.  Law and Analysis

### Sufficiency and Manifest Weight

{¶ 23} In Jackson's first and second assignments of error, he claims that there is insufficient evidence to establish that he aided and abetted in the drive-by shooting, and his convictions are against the manifest weight of the evidence.  We disagree.

{¶ 24} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 25} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386. "While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, citing *Thompkins*. "When considering a manifest-weight claim, a reviewing court must examine the entire record, weigh the evidence, and consider the credibility of witnesses." *Id.*, citing *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982). The court may reverse the judgment of conviction if it appears that the factfinder ""clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered."" *Id.*, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment should be reversed

as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 26} Jackson argues that there is no direct evidence of his involvement, his intent, or his motive, and that his convictions are based on inference stacking. We disagree and note that "'[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *Brook Park v. Gannon*, 2019-Ohio-2224, ¶ 24 (8th Dist.), quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.) citing *State v. Nicely*, 39 Ohio St.3d 147 (1988). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *Id.*, quoting *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.*; *see also State v. Hartman*, 2008-Ohio-3683 (8th Dist.) ("Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.").

{¶ 27} Ohio law, however, generally precludes the stacking of inferences to prove a claim. *State v. Brown*, 2018-Ohio-3674, ¶ 19 (8th Dist.), citing *Estate of Bier v. Am. Biltrite*, 2012-Ohio-1195, ¶ 22 (8th Dist.). "An inference which is based solely and entirely upon another inference, and which is unsupported by any additional fact or another inference from other facts is an inference upon an

inference and is universally condemned." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus; *State v. Wilborn*, 2024-Ohio-5003, ¶ 52 (8th Dist.); *Davis v. Cuyahoga Metro. Hous. Auth.*, 2012-Ohio-3077, ¶ 13 (8th Dist.).

{¶ 28} Nevertheless, circumstantial evidence and direct evidence inherently possess the same probative value. *Gannon* at ¶ 25, citing *Jenks*, at paragraph one of the syllabus. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460 (2001). "Since circumstantial evidence and direct evidence are indistinguishable so far as the * * * fact-finding function is concerned, all that is required of the [factfinder] is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks* at 272. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 2011-Ohio-6078, ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325 (1960).

{¶ 29} At trial, the State proceeded under a complicity theory, arguing that Billips, Jackson, and J.S. shot up Wilson's house to avenge the death of Billips's friend, J.L., killing the victim in the process and narrowly missing the five-year-old. R.C. 2923.03(A) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in

committing the offense." "'To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.'" *State v. McFarland*, 2020-Ohio-3343, ¶ 27-29, quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), at syllabus. "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971). Anyone who violates the complicity statute "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 30} Jackson was convicted of felony murder under R.C. 2903.02(B). Ohio's felony-murder statute provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.02(B). Felony murder does not require the State prove a mens rea element specific to the death of the victim. *State v. Owens*, 2020-Ohio-4616, ¶ 10, citing *State v. Fry*, 2010-Ohio-1017, ¶ 43 ("R.C. 2903.02(B), the felony-murder statute, does not contain a mens rea component."). In other words, the State does not have to prove that Jackson intended to kill the victim. The State, however, must prove the elements of the qualifying predicate offense — including any mens rea element specific to that criminal act. *Id.*

{¶ 31} In this case, Jackson was convicted of felony murder with the predicate offenses of felonious assault and improperly discharging into a habitation. Both felonious assault and improperly discharging into a habitation have a mens rea of "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22 (B).

{¶ 32} After viewing the evidence in a light most favorable to the prosecution, we find that there is sufficient evidence of Jackson's involvement in the drive-by shooting that resulted in the victim's death. The Ring and traffic-camera evidence unequivocally established that the black SUV registered to Jackson's mother was used in the commission of the crime. Jackson's mother testified that Jackson drove the SUV and had access to the vehicle on the day of the murder. Jackson, Billips, and J.S.'s cell phone records, as well as the traffic cameras and license plate readers, established that the three cell phones were together with the SUV as it travelled from Jackson's home in Cleveland to Wilson's home in Euclid, at the exact time of the murder, and then back to Cleveland. Finally, photos recovered from Jackson's cell phone depict Jackson and Billips and the SUV shortly after the murder. To believe that Jackson was not involved, as the prosecutor explained in closing arguments:

> [Y]ou would have to believe that the car was stolen before the murder, obviously, even though that Duane Jackson never left his house before they went to Euclid. You would also have to believe that all three of

their phones were in that car when that car was stolen. You would have to then believe that Duane Jackson borrowed somebody else's phone to call Mango, Brandon Robinson, to come get him three hours after the murder and then failed to tell police that I didn't actually use my own phone, I used somebody else's.

And then after the murder, you would have to believe that that generous car thief returned all three of their cell phones to them. What a — what a great thief. But then he didn't return the car. Just came back and gave them those cell phones. And then that same generous thief parked that vehicle 1800 feet from the individual that he stole it from even though the car was taken allegedly over at 76th and Union.

You would also have to believe that the car thief — at the time that the car thief returned those phones was in between the time that the murder occurred and the time that all three of them went back to [J.S.]'s, Billips's, and Jackson's house, and Jackson took that photograph of all three of them outside of the house.

Ladies and Gentlemen, I don't mean to be absurd about it, but all of those things are just not — not reasonable. None of those are reasonable.

(Tr. 1840-1841.)

{¶ 33} Furthermore, any rational trier of fact could conclude that Jackson acted knowingly when he participated in the drive-by shooting. The Ring camera clearly shows the SUV slowing down in front of Wilson's residence and seven gunshots ringing out from the front passenger side of the SUV hitting the victim and the house several times. In fact, it can be reasonably inferred from the evidence that Jackson was the shooter because Jackson was the major contributor of the DNA found on the front passenger seat cover, while Billips was excluded. Further, Billips was the major contributor to the DNA found on the gear shift, while Jackson was excluded. This corroborates Jackson's mother's testimony that she did not think Jackson was driving because of his ankle injury. In addition, photos recovered from

Jackson's cell phone, which were taken an hour after the murder, depict Jackson sitting in the front passenger seat of his SUV. The photos also depict what appears to be a handgun with an extended magazine sticking out of Jackson's pants and he is wearing one glove on his right hand. A person knows that he can cause serious physical harm by firing a gun multiple times out of a car window while aiming at house where people live. Accordingly, we find that there is sufficient circumstantial evidence to conclude that Jackson and Billips shared the same criminal intent.

{¶ 34} Finally, it has long been held that "[m]otive is not an element of the crime of murder and need not be established to warrant a conviction; proof of motive does not establish guilt, nor does want of proof thereof establish innocence; and, where the guilt of the accused is shown beyond a reasonable doubt, it is immaterial what the motive may have been for the crime, or whether any motive is shown." *State v. Lancaster*, 167 Ohio St. 391 (1958), paragraph two of the syllabus; *State v. Carstaphen*, 2022-Ohio-3129, ¶ 45 (8th Dist.); *State v. Allen*, 2005-Ohio-4813, ¶ 15 (8th Dist.). The reason Jackson, Billips, and J.S. committed these heinous crimes is of no consequence because we find that Jackson's actions before, during, and after the murder established that he knowingly participated in the drive-by shooting that resulted in the death of the victim.

{¶ 35} Therefore, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crimes charged. There was sufficient evidence to conclude that Jackson aided and abetted in the drive-by shooting. Furthermore, after reviewing the entire record,

weighing all the evidence, and considering the credibility of witnesses, we cannot say that the jury clearly lost its way; thus, Jackson's convictions are not against the manifest weight of the evidence.

{¶ 36} Accordingly, the first and second assignments of error are overruled.

**Hearsay**

{¶ 37} In Jackson's fifth assignment of error, he argues that he was deprived of a fair trial when the trial court allowed Jordin to testify to statements the victim made prior to his death.

{¶ 38} It is well-settled that the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. As the gatekeeper of the evidence, the trial court "must be cognizant of the evidence the state is attempting to admit into evidence. If the state fails to comport with the basic requirements under the law, the trial court is obligated to exclude such evidence, even if no objection is raised." *State v. Walker*, 2022-Ohio-1238, ¶ 32 (8th Dist.).

{¶ 39} Jackson asserts that Jordin's testimony regarding the victim's fear that he was being followed and had been previously shot at by someone in a black SUV, was inadmissible hearsay that violated Jackson's Sixth Amendment Right to Confrontation. The State argues that the statements are nontestimonial and admissible under Evid.R. 803(3).

{¶ 40} The Sixth Amendment's Confrontation Clause only applies to testimonial statements and does not apply to nontestimonial statements. *State v. Zadar*, 2011-Ohio-1060, ¶ 36-39 (8th Dist.), citing *State v. Siler*, 2007-Ohio-5637, ¶21. If a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. *Id.* If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules. *Id.* Nevertheless, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions to the hearsay rule. Evid.R. 802; *State v. Williams*, 2024-Ohio-838, ¶ 24 (8th Dist.). "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶ 41} In order to determine whether a statement to a non-law enforcement person is testimonial, the "objective witness" test applies. *State v. Stahl*, 2006-Ohio-5482, ¶ 36, citing *Crawford v. Washington,* 541 U.S. 36 (2004). This test requires the court to determine whether an objective witness would have reasonably believed that his statement would be available for use at a later trial. *Id.* The focus is on the expectation of the declarant at the time of making the statement. *Id.*, paragraph two of the syllabus.

{¶ 42} Here the statements made by the victim to Jordin are nontestimonial, because an objective witness under the same circumstances would not have reasonably believed his statements would be used later for trial. Thus, there is no

Confrontation Clause issue regarding the admission of the statements the victim made to Jordin.

{¶ 43} Because we find that the statements are nontestimonial, they are admissible if they fit within a hearsay exception. In this case, part of the victim's statements falls under Evid.R. 803(3), which allows introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." Testimony that a victim was fearful falls under this hearsay exception and is properly admitted. *State v. Tibbetts*, 92 Ohio St.3d 146, 158 (2001), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 22 (1987). *See also State v. Braden*, 2003-Ohio-1325, ¶ 100; *State v. Miller*, 2002-Ohio-4931. Therefore, the victim's statement that he feared for his life was admissible. The state-of-mind exception, however, does not permit witnesses to testify to the declarant's statements as to why he held a particular state of mind. *Tibbetts* at 159; *State v. Thomas*, 2018-Ohio-2841, ¶ 30-32 (8th Dist.) ("The state of mind exception under Evid.R. 803(3), 'does not include statements of belief of past events by declarant. To include statements of belief about a past event would negate the entire proscription against hearsay evidence.' 1980 Staff Notes, Evid.R. 803(3)."). Consequently, the statements as to why the victim was fearful — that a black SUV was following him and had shot at him previously — are hearsay and inadmissible.

{¶ 44} Since the statements were improperly admitted, we must determine whether the introduction of that testimony constitutes harmless error or requires a remand of the instant matter. Crim.R. 52(A) provides that "[a]ny error, defect,

irregularity, or variance which does not affect substantial rights shall be disregarded." A judgment of conviction shall not be reversed unless the accused was prejudiced by the admission of the evidence in question. R.C. 2945.83. The Ohio Supreme Court set forth a three-part test to determine whether the introduction of improper evidence affected the substantial rights of a defendant, thereby requiring a new trial, or whether the admission of that evidence constituted harmless error under Civ.R. 52(A):

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*State v. Morris*, 2014-Ohio-5052] at ¶ 25, 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*State v. Harris*, 2015-Ohio-166, ¶ 37; *see also State v. Boaston*, 2020-Ohio-1061, ¶ 63. The State bears the burden of demonstrating that the error did not affect the defendant's substantial rights. *State v. Johnson*, 2023-Ohio-445, ¶ 74 (8th Dist.), citing *State v. Graham*, 2020-Ohio-6700, ¶ 55; *State v. Perry*, 2004-Ohio-297, ¶ 15. "Error in the admission of evidence is harmless beyond a reasonable doubt when 'there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction.'" *State v. Jones*, 2023-Ohio-380, ¶ 141 (8th Dist.), citing *State v. McKelton*, 2016-Ohio-5735, ¶ 192, quoting *Schneble v. Florida*, 405 U.S. 427, 432 (1972).

{¶ 45} After reviewing the entire record, we find that there is no reasonable possibility that the improperly admitted testimony contributed to the conviction.

The Ring camera evidence unequivocally demonstrates that the victim was gunned down by someone in a black SUV. The victim's statements to Jordin regarding the black SUV were a nonissue. Thus, we find the trial court committed harmless error when it admitted the victim's statement.

{¶ 46} Accordingly, Jackson's fifth assignment of error is overruled.

## Ineffective Assistance of Counsel

{¶ 47} In Jackson's fourth assignment of error, he alleges that his counsel was deficient when he failed to object to the admission of rap lyrics written by Billips. He argues that the failure to object violated his Sixth Amendment Right to Confrontation and deprived him of a fair trial.

{¶ 48} "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Dix*, 2023-Ohio-4123, ¶ 32 (8th Dist.), quoting *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988). To establish ineffective assistance of counsel, appellant must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, citing *Strickland* at 697; *State v. Giguere*, 2023-Ohio-4649, ¶ 28 (8th Dist.).

{¶ 49} As stated above, the Confrontation Clause only bars the admission of testimonial statements, and the "objective witness" test applies to determine

whether the rap lyrics authored by Billips were testimonial. Here the rap lyrics authored by Billips are nontestimonial, because an objective witness under the same circumstances would not have reasonably believed his lyrics would be used later for trial against himself or anyone else. Thus, there is no Confrontation Clause issue regarding the admission of the lyrics. Furthermore, as discussed above, Evid.R. 803(3) allows the introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." The rap lyrics were written by Billips shortly before and altered shortly after the murder giving a window into Billips's state of mind, who was working in concert with Jackson. Thus, the rap lyrics were relevant and admissible, and trial counsel was not deficient when he did not object to their admission.

{¶ 50} Accordingly, Jackson's fourth assignment of error is overruled.

### Jury Instructions

{¶ 51} In Jackson's third assignment of error, he asserts that some evidence related solely to Billips and that the trial court erred when it denied his request for the "separate evidence" and "statement by one defendant" jury instructions from O.J.I. 409.15. The State argues that although Jackson requested the first instruction, he did not request the second instruction, and that neither instruction was warranted.

{¶ 52} Crim.R. 30 states that "a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to

consider its verdict, stating specifically the matter objected to and the grounds of the objection."

{¶ 53} When properly preserved, this court reviews "whether the trial court's refusal to give a requested [jury] instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Gibson*, 2023-Ohio-2481, ¶ 98 (8th Dist.), quoting *State v. Sims*, 2005-Ohio-5846, ¶ 12 (8th Dist.), citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). To show reversible error, the defendant must show that the trial court abused its discretion and that the error was not harmless. *State v. Malone*, 2015-Ohio-2150, ¶ 44 (8th Dist.); *State v. Blackman*, 2011-Ohio-2262, ¶ 32 (8th Dist.).

{¶ 54} When not preserved, this court reviews the failure to give a jury instruction for plain error. Crim.R. 52(B); *State v. Rogers*, 2015-Ohio-2459, ¶ 28. A defective jury instruction does not rise to the level of plain error unless it is clear that the outcome of the trial would have been different absent the error. *State v. Simpson*, 2008-Ohio-3817, ¶ 55 (8th Dist.). To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Pratts*, 2016-Ohio-8053, ¶ 34 (8th Dist.), citing *State v. Barnes*, 2002-Ohio-68; Crim.R. 52(B). Nevertheless, even if the plain-error standard is met, courts should only notice it "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St. 2d 91, 97 (1978), at paragraph three of the syllabus.

{¶ 55} At the close of evidence, Jackson requested — but was denied — the following jury instruction:

> 1) SEPARATE EVIDENCE. Evidence may be admitted against one defendant even though it may not be considered against (the other) (any other) defendant(s). You must carefully separate such evidence and consider it only as to the defendant to whom it applies.

(O.J.I. 409.15.)

{¶ 56} Jackson claims that there was no evidence that he knew the victim or had a motive to kill him; therefore, the testimony regarding Billips's tattoo commemorating his friend; the altercation at Euclid library involving Wilson; the large void of activity on Billips's phone; and the rap lyrics authored by Billips had no relevance to Jackson's case and should have only been considered against Billips. He argues that he was prejudiced by this error.

{¶ 57} Because the State proceeded under a complicity theory, the State was required to prove that Jackson aided and abetted in the commission of the crimes charge. To aid or abet is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment[.]'" *Johnson*, 93 Ohio St.3d at 243, quoting *Black's Law Dictionary* (7th Ed. 1999). According to R.C. 2923.03(F), anyone who violates the complicity statute "shall be prosecuted and punished as if he were a principal offender." Furthermore, participation in criminal intent may be inferred from a participant's presence, companionship, and conduct before, during, and after the offense was committed. By definition, the acts and motives of one participant is imputed upon the other. Therefore, a "separate evidence" instruction is nonsensical.

Accordingly, we find that the trial court's refusal to give the requested jury instruction was not error.

{¶ 58} Next Jackson argues that the admission of Billips's rap lyrics violated *Bruton v. United States*, 391 U.S. 123 (1968), and the trial court erred by not including the following jury instruction:

> 2) STATEMENT BY ONE DEFENDANT. A statement by one defendant made outside the presence of (the other) (any other) defendant(s) is admissible as to the defendant making the statement and must not be considered for any purpose as evidence against (the other) (any other) defendant(s).

(O.J.I. 409.15.)

{¶ 59} Since Jackson did not object to the omission of the jury instruction nor did he raise a *Bruton* issue at trial, he has waived all but plain error. In *Bruton*, the United States Supreme Court held that in a joint jury trial, confessions made by a codefendant who does not testify are inadmissible against the other defendant because that defendant has no opportunity to cross-examine the confessing codefendant. *Cassano*, 2012-Ohio-4047, ¶ 30 (8th Dist.), citing *Bruton* at 123. However, "if the out-of-court statement of a non-testifying codefendant is not testimonial, then *Bruton* has no application because the confrontation clause has no application. 'Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements.'" *State v. Carter*, 2017-Ohio-7501, ¶ 38-39 (7th Dist.), quoting *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009). *See also United States v. Vasquez*, 766 F.3d 373, 378 (5th Cir. 2014); *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir.

2013) ("*Bruton* is simply irrelevant in the context of nontestimonial statements * * * Statements that do not implicate the Confrontation Clause, a fortiori, do not implicate *Bruton*"); *United States v. Clark*, 717 F.3d 790, 816 (10th Cir. 2013) ("the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements"); *United States v. Berrios*, 676 F.3d 118, 128, (3d Cir. 2012) (because "*Bruton* is no more than a by-product of the Confrontation Clause," it is inapplicable to a non-testimonial prison yard conversation); *State v. Luckie*, 2018-Ohio-594, ¶ 44 (5th Dist.)

{¶ 60} As we have previously stated, the rap lyrics authored by Billips are nontestimonial, because an objective witness under the same circumstances would not have reasonably believed his lyrics would be used later for trial against himself or anyone else. Because we find the lyrics to be nontestimonial, there is no *Bruton* issue. Having found no *Bruton* issue, the rap lyrics, for what their worth, can be considered for Jackson, as well as Billips. Therefore, the "statement by one defendant" instruction was not necessary, and it was not error for the trial court to omit the jury instruction.

{¶ 61} Accordingly, Jackson's third assignment of error is overruled.

## Cumulative Error

{¶ 62} In Jackson's sixth assignment of error, he argues that the combination of errors regarding the admission of evidence undermines the integrity of the jury verdict and deprived Jackson of a fair trial. We disagree.

{¶ 63} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Allen*, 2016-Ohio-102, ¶ 53, citing *State v. Garner*, 74 Ohio St. 3d 49 (1995). However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Id.*; *State v. Brown*, 2003-Ohio-5059, ¶ 48. Because this court has found Jackson's arguments with regard to his other assignments of error unpersuasive, the cumulative-error doctrine does not apply.

{¶ 64} Accordingly, Jackson's sixth assignment of error is overruled.

### Consecutive Sentences

{¶ 65} In Jackson's seventh assignment of error, he asserts that the trial court did not make the proper findings to overcome the presumption of concurrent sentences and order consecutive sentences.

{¶ 66} Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence or vacate a sentence and remand for resentencing if it "clearly and convincingly" finds that (1) the record does not support the sentencing court's findings or (2) the sentence is "otherwise contrary to law."

{¶ 67} In order to overcome the presumption of concurrent sentences and impose consecutive sentences, R.C. 2929.14(C)(4) provides that the court must find that "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to

the seriousness of the offender's conduct and to the danger the offender poses to the public." The court must also make at least one of the findings set forth under R.C. 2929.14(C)(4)(a)-(c). Relevant to this case is subsection (b), which states that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." R.C. 2929.14(C)(4)(b).

{¶ 68} Jackson asserts that the trial court failed to make the required finding that the sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Further, Jackson contends that the course-of-conduct finding was inadequate. We disagree.

{¶ 69} At sentencing the trial court stated as follows:

So, Count 3 is murder, life in prison, possibility of parole after 15 years; three-year firearm specification must be served prior to and consecutive to that.

Count 4 [felonious assault — serious physical harm] and Count 5 merge [felonious assault — deadly weapon], no convictions are recorded; no judgments on those counts.

Count 6 is improperly discharging a firearm into a habitation or school. Three-year firearm specification will be imposed, consecutive to the three-year firearm specification in Count 3 [murder]. I'm finding that it is not an allied offense. There are separate victims, and, therefore, separate animus can be imputed to this Defendant in Count 6. I'm imposing [on Count 6] a felony of the second degree, eight years in prison.

In Count 7, discharge of a firearm at or near prohibited premises, a three-year firearm specification. I'm going to find that that does merge,

Count 7 with Count 3 [murder], and no sentence will be imposed on Count 7.

Count 10 is tampering with evidence, felony of the third degree, 36 months in Lorain Correctional Institution.

So the imposition of a consecutive sentence is appropriate in this matter.

I find specifically that it's necessary to protect the public and to punish this offender. It is not disproportionate to what occurred in this matter.

And that the harm is so great or unusual, taking the life of a 13-year-old child, that a single term does not adequately reflect the seriousness of the conduct, and each bit of this conduct added up to a loss of life.

And so Count 3 [murder] and Count 6 [improperly discharging a firearm] and Count 10 [tampering] will be served consecutive to each other. So two three-year firearm specifications are six years, plus the eight years in Count 6, plus the three years in Count 10, 32 years.

(Tr. 1962-1963.)

{¶ 70} We note that "[w]hen imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing" and "incorporate its statutory findings into the sentencing entry." *State v. Bonnell*, 2014-Ohio-3177, ¶ 29. The trial court is not required to recite verbatim the statutory language; however, we must be able to glean from the record that all of the findings required by R.C. 2929.14(C) were made by the trial court. *Id*. at ¶ 36-37.

{¶ 71} After reviewing the record, we find that the trial court made the required findings to order consecutive sentences. The trial court specifically stated that consecutive sentences were necessary to protect the public and punish the offender and not disproportionate to "what occurred in this matter." The trial court stated that "[t]his case is extremely tragic in every which way. It affects not only [the

victim's] family, the Defendant's family, the Defendants themselves, and the community as a whole." (Tr. 1960.) Regarding the course-of-conduct finding, the trial court stated "that the harm is so great or unusual, taking the life of a 13-year-old child, that a single term does not adequately reflect the seriousness of the conduct, and each bit of this conduct added up to a loss of life." (Tr. 1963.) Contrary to Jackson's assertion, the record is clear that the conduct the court is referring to is driving by and firing seven rounds into someone's home.

{¶ 72} Accordingly, Jackson's seventh assignment of error is overruled.

{¶ 73} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
SEAN C. GALLAGHER, J., CONCUR