[Cite as *State v. Kinney*, 2025-Ohio-1620.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-24-016

      Appellee                              Trial Court No. 2023 CR 0280

v.

Sonya Kinney                                **DECISION AND JUDGMENT**

      Appellant                             Decided: May 6, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Sonya Kinney, appeals the
January 29, 2024 judgment of the Wood County Court of Common Pleas, convicting her
of aggravated vehicular homicide, falsification, operating a vehicle while under the
influence of alcohol, operating a vehicle with a prohibited alcohol concentration, and
driving under suspension.  For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} Sonya Kinney was charged in a six-count indictment with the following offenses: (1) aggravated vehicular homicide, a violation of R.C. 2903.06(A)(1)(a) and (B)(2)(b)(i), a first-degree felony (Count 1); (2) aggravated vehicular homicide, a violation of R.C. 2903.06(A)(2)(a) and (B)(3), a second-degree felony (Count 2); (3) falsification, a violation of R.C. 2921.13(A)(3) and (F)(1), a first-degree misdemeanor (Count 3); (4) operating a vehicle while under the influence of alcohol, a violation of R.C. 4511.19(A)(1)(a) and (G)(1)(a), an unclassified misdemeanor (Count 4); (5) operating a vehicle with a prohibited alcohol concentration, a violation of R.C. 4511.19(A)(1)(d) and (G)(1)(a), a first-degree misdemeanor (Count 5); and (6) driving under suspension, a violation of R.C. 4510.11(A) and (D)(1), a first-degree misdemeanor (Count 6). Her co-defendant, Ivory Quinn, was charged with the same offenses except Count 5. These charges stemmed from a motor vehicle accident that occurred on December 3, 2022, and caused the death of B.H.

{¶ 3} The matter was tried to a jury beginning January 10, 2024. The State presented the testimony of P.M., a motorist who witnessed the accident; Ohio State Highway Patrol Trooper Christopher Kiefer and Sergeant Garrett Lawson, both of whom responded to the accident; Edward Yingling, a criminalist in the Highway Patrol's Columbus crime lab; Trooper Kyle Baxter, an accident reconstructionist; Robyn Shinaver, the chief toxicologist and laboratory director for the Lucas County Coroner's toxicology lab; and Thomas Blomquist, M.D., a forensic pathologist and deputy coroner

2.

in the Lucas County Coroner's Office. Numerous exhibits were admitted at trial, including photographs; reports from the reconstructionist, criminalist, toxicologist, and pathologist; written statements from Kinney and her co-defendant; and recordings from body worn cameras, dashboard cameras, and cameras located in the cabin of the Ohio State Highway Patrol vehicles.

### A. The evidence reveals how the accident occurred.

{¶ 4} According to the evidence presented at trial, on December 3, 2022, Quinn and Kinney, were traveling on northbound I-75 after getting off work at 10:00 p.m. Quinn was driving a Cadillac SUV and Kinney was the front-seat passenger. Both women had been drinking alcohol at work. At approximately milepost 171, for reasons she could not explain, Kinney grabbed the steering wheel while Quinn was driving 83 miles per hour in the center lane. Quinn was unable to right the vehicle, and it careened into the left lane and collided with the concrete barrier dividing northbound and southbound I-75. This rendered the vehicle inoperable.

{¶ 5} Quinn and Kinney abandoned the vehicle in the left lane with no hazard lights or headlights. Moments after exiting the vehicle, B.H. was driving her Ford sedan in the left lane at approximately 71 miles per hour. Her vehicle collided with the Cadillac. Shortly thereafter, a Toyota carrying Kinney's boyfriend and three of Quinn and Kinney's co-workers came along, traveling 75 miles per hour. The driver swerved to avoid either the vehicles or the debris. The Toyota spun and became pinned by the Ford against the concrete barrier.

3.

{¶ 6} B.H. was pronounced dead at the scene. The autopsy revealed that she died from blunt force trauma caused by the accident.

**B. Quinn and Kinney lie about how the accident occurred.**

{¶ 7} Emergency personnel arrived to a chaotic scene. It was not immediately apparent how the crash occurred. The Cadillac was in the right lane. It had impact damage to both the front and rear of the vehicle, the airbags were deployed, the tires were deflated, it had leaked a large amount of fluid, and the rear windshield was broken out. The Ford had significant impact damage to the rear left side, engine compartment, front left panel, quarter panel wheel well, and driver's door. The airbags had deployed, and the rear left door was torn from the vehicle. The Ford was situated perpendicularly to the Toyota, which was pressed against the concrete barrier dividing northbound and southbound I-75. The Toyota was facing southbound in the northbound lane. People were lying on the asphalt wrapped in blankets.

{¶ 8} While they were standing along the concrete divider, Trooper Kiefer spoke with Quinn and Kinney and attempted to get verbal statements. Quinn was quiet at first, but both she and Kinney reported that they were attempting to switch lanes when they were rear-ended by the Ford and forced into the concrete barrier. Kinney said they were in the right lane trying to go to the left. Quinn said they were in the left lane trying to go to the middle lane. But Quinn and Kinney both told Trooper Kiefer that their vehicle and the decedent's vehicle were moving at the time of the crash. They did not say that the

4.

Cadillac SUV was disabled and, in fact, Kinney stated there were no issues with their vehicle.

{¶ 9} It was extremely cold outside, and officers were still investigating the crash and needed to get Quinn and Kinney's statements, so officers placed them in the rear of Sergeant Lawson's police vehicle. Sergeant Lawson attempted to get a written statement from them, but they weren't providing much useful information. Quinn said that she couldn't write because her hands were cold and possibly injured. She passed the statement form to Kinney to write and they attempted to draft a statement together.

{¶ 10} Sergeant Lawson eventually took a statement in question-and-answer form, and wrote the information down himself. Quinn said they had just gotten off work at 10:00 p.m. at Teijin Automotive in North Baltimore. She was trying to get into the right lane when they were rear-ended by a quickly-approaching vehicle. Quinn estimated that she was traveling 70 to 80 miles per hour. She told Trooper Kiefer that she did not know what lane she was in when the collision occurred, she did not see headlights, and she did not know how fast the other vehicle was going. Quinn claimed that a couple of seconds before attempting the lane change, she activated her turn signal. She conceded that she was not wearing her seatbelt, but denied that she had consumed drugs or alcohol or that she was in any way distracted. Quinn stated that she and Kinney knew the occupants of the Toyota because they worked together. She said she was injured a little around her wrist and hand.

5.

{¶ 11} Quinn and Kinney's version of events did not seem consistent with the evidence at the scene. It was also not consistent with what was reported by a witness to the crash. That witness, P.M., told Trooper Kiefer that he and his wife and kids were travelling northbound in the middle lane of traffic when he saw a disabled Cadillac stopped in the left lane with no flashers or lights. He remarked, "oh shit, there's going to be an accident," but before he could do anything, the Ford driving next to him in the left lane hit the Cadillac. Upon the impact, P.M.'s windshield was showered with glass. He swerved hard, and when he glanced in the side mirror, he saw the Cadillac and the Ford spinning out. P.M. said that there was no time to react and if he had been in the left lane, he would have hit the disabled vehicle.

{¶ 12} P.M. stopped and backed up his vehicle, and his wife called 9-1-1. They ran to the Ford and encountered B.H. His wife stayed with B.H. and P.M. went to the Cadillac. He didn't see anyone. He went back to his truck to get a brighter flashlight, and when he returned, another man at the scene said, "I found [the occupants of the Cadillac], they're over here"— "way back like where the actual crash started." Quinn and Kinney were further down the road—away from the crash site—out of the vehicle and on the shoulder of the road.

{¶ 13} Sergeant Lawson left Quinn and Kinney alone in the back of his patrol car for several minutes. While still at the scene, he viewed footage of Quinn and Kinney's interaction in the patrol car. Kinney asked Quinn if she felt drunk. Quinn told her it didn't matter because Kinney had "fucked up [her] whole life." Kinney wondered if

6.

Quinn would blow over the legal limit. Quinn replied that she would. Quinn asked Kinney why she yanked the steering wheel. She said that it had sent the vehicle out of control and asked, "why did you do that?" Kinney responded that she didn't mean to do it and she didn't know why she did it. Quinn said, "all I know is you yanked the steering wheel and I couldn't control the fucking car[.]"

{¶ 14} Someone transmitted over the police radio that the decision had been made to pronounce B.H. dead at the scene. Kinney was visibly distraught by this news, however, this did not prompt her or Quinn to provide officers with accurate information about how the accident occurred.

## C. Officers suspect alcohol use.

{¶ 15} While Quinn and Kinney were seated in the back seat of the patrol car, Sergeant Lawson noticed a strong odor of alcohol. He asked if they had been drinking. Kinney said that she drank approximately two hours earlier, but she wasn't driving. Quinn denied that she had been drinking. Sergeant Lawson and Trooper Kiefer decided to separate Quinn and Kinney so they could determine the source of the odor of alcohol.

{¶ 16} Kinney was taken to the back of Trooper Kiefer's patrol car. He noted a strong odor of alcohol emitting from Kinney's person and observed other potential indicators that she was impaired, including bloodshot, glassy eyes, and droopy eye lids. As for Quinn, the odor of alcohol did not dissipate when Kinney was removed from the vehicle. Sergeant Lawson also observed that Quinn had droopy eye lids and bloodshot

7.

eyes. Quinn took a portable breath test and registered a blood-alcohol concentration ("BAC") of 0.119.

### D. Quinn and Kinney are arrested and taken to the patrol post.

{¶ 17} Based on Trooper Kiefer and Sergeant Lawson's observations, they placed Quinn and Kinney in investigative detention. The women were ultimately arrested and transported to the patrol post.

{¶ 18} On the ride to the patrol post, Quinn admitted consuming alcohol at work that night. She also stated that she and Kinney were trying to get their licenses back. At the post, Sergeant Lawson ran a records check for Quinn, which revealed that her license was under suspension and she had two prior OVI convictions—one from March 27, 2015, and one from December 16, 2016. Quinn stipulated to both of these facts at trial. Kinney stipulated that her license was under suspension. These stipulations were read to the jury and admitted as exhibits.

{¶ 19} Although she had taken a portable breathalyzer test, Quinn refused to take the official breath test on the Intoxilyzer 8000 machine. Given the severity of the crime and Quinn's prior record, the officers obtained a search warrant to do a forced blood draw at the hospital. Quinn's blood was drawn at Wood County Hospital on December 4, 2022, at 2:16 a.m.

{¶ 20} Quinn had a backpack with her at the scene of the accident. Sergeant Lawson placed it in the trunk of his patrol car and searched it after arresting Quinn. There was an almost-empty bottle of vodka in the backpack. Trooper Kiefer testified that

8.

based on the signs of impairment he observed—the strong odor of alcohol, droopy eye lids, bloodshot glassy eyes, and the manner of the crash—plus Quinn's admission to drinking alcohol, he ultimately deemed that alcohol had impaired her central nervous system.

{¶ 21} While at the post, Kinney agreed to submit to a breath test with the Intoxilyzer 8000 machine. At approximately 12:40 a.m.—two-and-a-half hours after the accident—she had a BAC of 0.102, above the legal limit for operating a motor vehicle. While Trooper Kiefer was transporting Quinn to the hospital, Sergeant Lawson spoke with Kinney. Kinney showed signs of alcohol impairment, including a strong odor of an alcoholic beverage, bloodshot glassy eyes, depressed nervous system, and lackadaisical demeanor.

{¶ 22} Trooper Keifer and Sergeant Lawson both testified that speed and marked-lanes violations are the most common traffic infractions committed by impaired drivers.

### E. Kinney is questioned at the station.

{¶ 23} Kinney was questioned at the Highway Patrol post after her arrest. She told Sergeant Lawson that she and Quinn left work at 10 p.m. and were on the road driving. She was the front right passenger. For reasons she could not explain, she touched the wheel "just a little bit though" and they spun out of control. Quinn tried to swerve to avoid hitting the dividing wall, but the car became disabled near the wall. There were no cars around, but no longer than a minute after they exited the vehicle, the decedent's vehicle came up fast and hit the back of their car. The impact pushed Quinn

9.

and Kinney's car 15 to 20 feet. Kinney claimed they didn't have time to put on the hazards. She denied that Quinn was on the phone. Kinney said that they were having a normal conversation and she didn't know what made her touch the wheel.

{¶ 24} Kinney stated that she consumed a little less than half a pint of Tequila, but this was before they got on the road. She did not know how much Quinn had to drink. Neither of them drank any alcohol after the crash. Kinney claimed that they had their seatbelts on. She did not know where the third car came from and claimed that she originally gave a different statement because of the shock of it all and because she was scared because they both had been drinking. After the crash, Quinn was "pretty fucking pissed" and asked why Kinney "would do that." Kinney told her that she didn't know why. Kinney said that she tried to restart the car to get it out of the road, but it wouldn't start, and that's when the decedent's car came "really fast."

{¶ 25} Sergeant Lawson did not believe that Kinney touched the wheel "just a little bit" because touching the wheel "just a little bit" would not have caused it to careen out of control. The rest of what Kinney said—about crashing into the concrete barrier— was consistent with the front-end damage to the Cadillac, and the second collision was consistent with the rear damage to the Cadillac.

{¶ 26} Trooper Kiefer confirmed that it is not illegal for a passenger to have consumed alcohol. He did not know whether Kinney was ever in the driver's seat or whether she ever had her foot on the gas pedal or the brake pedal of the vehicle. But Trooper Kiefer's view was that it is illegal for an impaired passenger to jerk the steering

10.

wheel, causing movement of that vehicle. Both Trooper Kiefer and Sergeant Lawson testified that despite the fact that acceleration is also required, touching the wheel of a vehicle creates movement if it moves the steering wheel in any way.

**F. Experts determine that Quinn's BAC was over the legal limit.**

{¶ 27} Edward Yingling works as a criminalist at the Highway Patrol's crime lab in Columbus, Ohio. Using gas chromatography, he analyzed Quinn's blood to determine the grams of alcohol per milliliter and prepared a report of his findings. He calculated a BAC of 0.094—above the per se limit of 0.08 for operating a motor vehicle within the State of Ohio. Robyn Shinaver, the chief toxicologist and laboratory director for the Lucas County Coroner's toxicology lab, performed a retrograde extrapolation and estimated that Quinn's blood-alcohol concentration at the time of the crash was likely between 0.1248 and 0.1556, a level consistent with impairment.

**G. The accident report is prepared.**

{¶ 28} Trooper Kiefer authored the crash report. He described some of the physical road evidence observed at the crash scene, including skid and yaw marks. He explained that a skid mark is a dark area in the road made by the force of a vehicle coming to a straightforward stop. A yaw mark occurs when the car is moving faster than the vehicle can handle and "yaw[s] around in a circular motion."

{¶ 29} Trooper Kiefer and Sergeant Lawson both testified that there were two crashes here. The first crash occurred when the Cadillac hit the wall and became disabled in the left lane of the highway. The fluid and skid marks indicate that the Cadillac veered

11.

off the road, struck the concrete median wall, spun around, and came to final rest in the left lane. The Ford then came along and rear-ended the Cadillac, forcing it further ahead into the right lane. The occupants of the Cadillac were not in the vehicle at the time of the second impact. The Toyota was traveling northbound and attempted to veer away from the debris from the first collision, but became involved in the crash. The Toyota ended up alongside the concrete highway barrier, and the front of the Ford was rammed into the driver's side of the Toyota. Trooper Kiefer did not know whether all occupants of the vehicles wore seatbelts or whether all air bags were deployed in all three of the vehicles involved. He observed that some air bags were deployed.

{¶ 30} Trooper Kiefer noted in his report factors that contributed to the accident. As to both the Ford and the Toyota, he indicated in the report that they were following too closely—i.e., they failed to maintain an assured clear safe distance. He also checked the distracted driving box, however it was unknown whether B.H. had been distracted. Other than the fact that B.H. collided with Quinn's vehicle, there were no other indicators that she had failed to maintain an assured clear distance. Trooper Kiefer explained that this notation is made regardless of whether the driver had the opportunity to see, detect, or perceive a disabled vehicle in the roadway. B.H. was not wearing a seatbelt.

{¶ 31} Neither Trooper Kiefer nor Sergeant Lawson knew whether Kinney ever tried to restart the Cadillac to try to move it out of the road or whether she ever had the keys to the vehicle. Sergeant Lawson did not know if Kinney ever had her foot on the gas pedal or the brake pedal. He did not believe that Kinney was ever in the driver's seat.

12.

Sergeant Lawson testified that there was no evidence that Quinn or Kinney attempted to call 9-1-1 to report that their vehicle was disabled in the middle of the roadway.

{¶ 32} Sergeant Lawson testified that Kinney and Quinn's cellphones were seized, but they were not analyzed to determine whether they were texting at the time of the accident. B.H.'s phone was not collected as evidence, so there is no way to know whether she may have been texting or talking on her phone at the time of the accident. The investigation produced no evidence of distracted driving by the drivers of the Ford or the Toyota. Testing performed at autopsy indicated that B.H. had Benadryl, oxycodone, and oxymorphone in her blood that she had metabolized for some time. Dr. Blomquist acknowledged that these drugs could reduce reaction time, but he also said that individuals have significant variations in tolerance to these drugs.

### H. An accident reconstructionist renders conclusions.

{¶ 33} Trooper Kyle Baxter works in the crash reconstruction unit of the Ohio State Highway Patrol. He was contacted about this crash the day after it occurred. He reviewed the crash report, pertinent safety-recall information, photos of the scene and the vehicles, and the vehicles' event data recorders ("EDRs"). He prepared a reconstruction report documenting his findings. Trooper Baxter concluded that the crash that began the entire sequence of events was the Cadillac colliding with the center dividing wall.

{¶ 34} As part of his analysis, Trooper Baxter checked for open recalls on all three vehicles. The Ford had two active recalls—one relating to door latch issues and the other

13.

relating to leakage of brake fluid—but he saw nothing to suggest that those recalls played any role in the collisions. There were no active recalls for the Cadillac or Toyota.

{¶ 35} Trooper Baxter observed tire marks traveling toward the left shoulder of the road and damage to the concrete wall. These marks indicate that the Cadillac veered off the road and struck the concrete barrier. Puddling of fluid in the road shows that it came to a final rest in the middle of the left lane of the roadway. It remained there until it was struck by the Ford. Gouging in the roadway north of the puddle of fluid is consistent with the underbody of the vehicle coming into contact with the asphalt. Gouging like that typically results from the interaction of two vehicles, forcing a vehicle downward onto the roadway.

{¶ 36} Trooper Baxter was able to retrieve information from the vehicles' EDRs. The EDR is powered by the vehicle's battery or electrical system, so it is not capable of recording when the vehicle is turned off. The EDR would not provide information concerning how much time passed between when the Cadillac became disabled and when it was struck by the Ford or indicate when the Ford was struck by the Toyota. There was no data concerning movement of the Cadillac's steering wheel, and he did not recall the data regarding seatbelt use or whether every air bag in every vehicle deployed. There was no evidence of the EDR malfunctioning.

{¶ 37} Trooper Baxter explained that a vehicle's EDR makes the decision—within milliseconds—whether to deploy the vehicle's airbags. The EDR may save information for deployment versus non-deployment events. The EDR in the Cadillac noted a

14.

deployment event and a non-deployment event that were 0.04 seconds apart, indicating that they resulted from the same event. The deployment event was the collision with the concrete barrier. The vehicle's EDR indicated that the Cadillac was traveling 83 miles per hour before it veered off the road and slammed into the wall, 13 miles per hour above the 70-mile-per-hour speed limit. The EDR report does not contain information concerning whether the Cadillac's hazard lights, taillights, or other source of illumination was on. Trooper Baxter acknowledged that at night, it can be very dangerous for a non-illuminated vehicle to be disabled in a lane of travel, and even more so the higher the speed limit.

{¶ 38} The EDR report indicates that the Ford was travelling between 69 and 71 miles per hour at the time of the collision, but because its tires were a little too big for the vehicle, the speed was more likely 71 to 73 miles per hour. The EDR suggests that cruise control was set because it detected no pressure on the accelerator. The EDR shows that the decedent applied the brakes a half-second before impact, but it was not a hard brake. The speed as the brakes were applied was reported as 41.5 miles per hour. Trooper Baxter explained that research and testing demonstrates that it takes roughly 1.5 seconds from the time that a person perceives a possible threat and the time for the brain to process what the person is seeing and to make a cognitive decision to do something in reaction to that perceived threat. The fact that the threat here occurred at night and the Cadillac was a dark color—gray—and was not illuminated would affect the ability to

15.

perceive the threat. At 70 miles an hour, a vehicle travels about 100 feet per second. At that speed, a vehicle would travel about 150 feet in a second and a half.

{¶ 39} Before impact, the Toyota was traveling 75 miles per hour. The driver swerved to avoid debris or the vehicles, spun, and ended up facing the opposite direction when it became pinned against the wall. The brakes were applied two seconds before impact, and half a second after the brakes were applied, the EDR detected a speed of 59.7 miles per hour.

{¶ 40} Based on his evaluation and analysis, Trooper Baxter found that there was one vehicle involved in the first crash—the Cadillac SUV, occupied by Quinn and Kinney—and three vehicles involved in the second crash—the Cadillac, the Ford, and the Toyota. The Ford had one occupant, and the Toyota had four occupants.

## I. The jury convicts Quinn and Kinney.

{¶ 41} The jury found both Kinney and Quinn guilty on all counts. As to Kinney, Counts 1 and 2 and Counts 4 and 5 merged for purposes of sentencing, and the State elected to have her sentenced on Counts 1 and 4. The court imposed a prison term of six to nine years on Count 1. It sentenced her to a term of 180 days on Count 3, 180 days on Count 4, and 180 days on Count 6, all to be served concurrently to the term imposed on Count 1. Kinney appealed. She assigns the following errors for our review:

> I.   The trial court erred, and violated Ms. Kinney's right to confrontation of witnesses under the Ohio and United States Constitutions, or alternatively committed plain error when it permitted prejudicial statements of Ms. Kinney's co-defendant to be admitted without her being subject to cross-examination[.]

16.

II.    The convictions are insufficient of evidence under the Ohio and United States Constitutions as to counts 1, 2, 4, 5, and 6, and the convictions stand against the manifest weight of the evidence[.]

III.    Ms. Kinney was denied effective assistance of counsel under the Ohio and United States Constitutions and the case must be reversed[.]

## II.  Law and Analysis

{¶ 42} In her first assignment of error, Kinney argues that her right to confrontation was violated when the trial court admitted prejudicial statements that Quinn made to Sergeant Lawson while he was driving her to the patrol post.  In her second assignment of error, she argues that her convictions of Counts 1, 2, 4, 5, and 6 were not supported by the weight or sufficiency of the evidence.  And in her third assignment of error, she argues that trial counsel was ineffective for failing to request appropriate jury instructions, failing to raise hearsay objections, and failing to object to improper statements by the State during its closing argument.

## A.  Right to Confrontation

{¶ 43} In her first assignment of error, Kinney argues that her right to confront the witnesses against her was violated when the trial court allowed the State to admit statements that Quinn made while she was being transported to the Ohio State Highway Patrol post.  Kinney complains that Quinn stated that Kinney "jerked" the steering wheel, which, she maintains went "far, far further than anything that Ms. Kinney ever said herself."  Kinney complains that "the description by Ms. Quinn of Ms. Kinney's supposed actions depict some sort of maniacal, and apparently suicidal, wrestling with the wheel that is only remotely believable because it was not subjected to cross-

17.

examination." Kinney acknowledges that the trial court instructed the jury that Quinn's statements were admissible only as to Quinn and could "not be considered for any purpose as evidence against the other Defendant," but she claims that the admission of the statements nevertheless deprived her of a fair trial. She insists that she preserved this error for appeal when she objected to the cases being joined for trial.

{¶ 44} The State responds that Kinney either waived or forfeited any error here because trial counsel did not object when the statements (contained in video exhibits) were admitted and played for the jury, and, in fact, she agreed to the court's limiting instruction. It denies that Quinn's statements were improperly admitted. The State further claims that any error here was harmless because the evidence was cumulative of the video recording of Quinn and Kinney's conversation in the back of the cruiser.

{¶ 45} The Sixth Amendment's Confrontation Clause provides an accused the right to be confronted with the witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). Section 10, Article I of the Ohio Constitution provides similar rights. *State v. Self*, 56 Ohio St.3d 73, 79 (1990). In *Crawford,* the U.S. Supreme Court held that the admission of out-of-court statements violates the Sixth Amendment when the statements "are testimonial and the defendant has had no opportunity to cross-examine the declarant." *State v. Arnold,* 2010-Ohio-2742, ¶ 13, citing *Crawford* at 68. We conduct a de novo review of evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 2016-Ohio-5735, ¶ 97.

18.

{¶ 46} In *Bruton v. United States*, 391 U.S. 123, 136-137 (1968), the U.S. Supreme Court held that where two defendants are jointly tried, a confession by a non-testifying co-defendant could not be admitted into evidence even with a limiting instruction prohibiting the jury from considering the confession against the non-confessing defendant. The Court reasoned that the introduction of the confession implicating the non-confessing defendant without opportunity for cross-examination deprived the non-confessing defendant of his right to confrontation. "The *Bruton* rule, as applied in Ohio, is not limited to confessions, but to any extrajudicial statements made by the codefendant inculpating the accused." *State v. White,* 1998 WL 183849 (8th Dist. Apr. 16, 1998), citing *State v. Moritz*, 63 Ohio St.2d 150 (1980), paragraph one of the syllabus ("An accused's right of cross-examination secured by the confrontation clause of the Sixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused.").

{¶ 47} The State argues that *Bruton* was not violated because Quinn was merely having a conversation with Sergeant Lawson—she did not make a confession. Quinn had been arrested, she was handcuffed in the back of a police car, she was being transported to the station for further investigation and to be criminally charged, and she made statements to Sergeant Lawson that directly implicated Kinney and damaged her own position. We disagree with the State—and the trial court—that the admission of these statements did not violate *Bruton*.

19.

{¶ 48} But the Ohio Supreme Court recognized in *Moritz* that an error in admitting evidence prohibited by *Bruton* may be harmless. *Id.* at 155-156, citing *Schneble v. Florida*, 405 U.S. 427, 430 (1972). Moreover, a defendant forfeits all but plain error by failing to object to a potential *Bruton* issue. *State v. Jennings,* 2009-Ohio-6840, ¶ 78 (10th Dist.); *State v. Jackson,* 2025-Ohio-109,¶ 59 (8th Dist.).

{¶ 49} Here, Kinney opposed joinder of the cases solely on the basis that admission of Quinn's statements would violate *Bruton.* And before trial, Kinney's attorney renewed his objection to joining the cases for trial. He told the court: "If this suffices, I won't put those out in the record on the courtroom." The court responded: "It suffices for me. If you want to say I have a continuing objection, that's fine. I'm going to note that you both have continuing objections to both joinder and your request to sever."

{¶ 50} Having said this, when the State moved to admit and publish to the jury the recording of Quinn's statements, Kinney's counsel did not lodge an objection to the evidence. To the contrary, when asked by the court if defense counsel had any objection, defense counsel responded, "[n]o objection." Defense counsel's explicit statement—"no objection"—when the controverted evidence was offered into evidence certainly calls into question the efficacy of his earlier attempt to preserve error. And whether error was preserved here determines whether we apply a harmless-error or plain-error standard of review. Although we are inclined to conclude that defense counsel negated his previous attempt to preserve error by stating "no objection," we find that even employing a

20.

harmless-error analysis, admission of Quinn's statements implicating Kinney did not constitute reversible error.

{¶ 51} Under Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." An error affects "substantial rights" if it was prejudicial. *State v. Fisher,* 2003-Ohio-2761, ¶ 7, quoting *United States v. Olano,* 507 U.S. 725, 734 (1993). The Ohio Supreme Court utilizes a three-part analysis to determine whether the erroneous admission of evidence affected the defendant's substantial rights, requiring a new trial, or whether the admission of that evidence was harmless error under Crim.R. 52(A): (1) whether the defendant was prejudiced by the error, i.e., whether it had an impact on the verdict; (2) whether the error was not harmless beyond a reasonable doubt; and (3) whether, once the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *State v. Harris,* 2015-Ohio-166, ¶ 37, citing *State v. Morris,* 2014-Ohio-5052, ¶ 22–29.

{¶ 52} Here, the evidence at issue was cumulative. While Quinn repeatedly stated to Sergeant Lawson that Kinney grabbed the steering wheel, causing her to lose control of the vehicle, Quinn made these same statements in a conversation with Kinney herself while the two of them were seated in the back of the cruiser. The recording of their conversation was played for the jury:

Quinn: Why would you do that, Sonya?

Kinney: I didn't even mean to fucking do that, dude.

Quinn: What made you do that though? Why would you do that?

21.

Kinney:  I didn't even mean to even, just like, even, touch the fucking steering wheel.

Quinn:  But why would you do that though?

Kinney:  I didn't even mean to touch the steering wheel.

Quinn:  But what caused you to do it?  You yanked the whole steering wheel, we just went out of control, because you yanked the fucking steering wheel, like why would you do that?  Why would you do that, I don't understand.  Why would you do that if you didn't have any intentions on like. . . .  You just yanked it.

Kinney:  What were we even talking about for me to even do that?

Quinn:  I don't know.  I don't even remember.  I know you yanked the steering wheel, and I couldn't control the fucking car.  We went over there; we went over there.  Bitch.  Now I got all this shit on me because I was the driver.  I did not mean, like.

Kinney:  I'm sorry, I'm sorry.  Like for real, I don't even.

Quinn:  He smelled the liquor, like.  I've made it home worse than this. . . . You don't know why you did the shit, I don't know why you did the shit. My whole life fucked up.  I got to start all over because you want to do the stupid shit.

Kinney:  I'm sorry.

{¶ 53} Because Quinn made these same incriminating accusations *directly to Kinney* and Kinney acknowledged them and apologized, Quinn's statements to Sergeant Lawson were cumulative to other properly-admitted evidence.  While Kinney claims that Quinn's statements went "far, far further than anything that Ms. Kinney ever said herself," we disagree.[1]  Frankly, the statements were more impactful when they were

---

[1] We also disagree with Kinney that "the description by Ms. Quinn of Ms. Kinney's supposed actions depict some sort of maniacal, and apparently suicidal, wrestling with

22.

made directly to—and acknowledged by—Kinney.  As such, we find that Kinney was not prejudiced by the admission of Quinn's statements to Sergeant Lawson, any error in admitting the statements was harmless beyond a reasonable doubt, and even excising the statements, the remaining evidence establishes Kinney's guilt beyond a reasonable doubt.

{¶ 54} Accordingly, we find Kinney's first assignment of error not well-taken.

## B.  Sufficiency and Weight

{¶ 55} In her second assignment of error, Kinney argues that her convictions of Counts 1, 2, 4, 5, and 6 were not supported by the weight or sufficiency of the evidence. Whether there is sufficient evidence to support a conviction is a question of law.  *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).  In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Walker,* 55 Ohio St.2d 208, 212 (1978).  "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law."  *State v. Richardson*, 2016-Ohio-8448, ¶ 13.  Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence."  *Id.*

---

the wheel. . . ."  This is not how Quinn described it.  She merely stated that Kinney inexplicably "yanked" or "grabbed" the wheel and Quinn lost control.  She never described that the two wrestled over the wheel.

23.

{¶ 56} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 57} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions

24.

of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 58} Before addressing Kinney's convictions of Counts 1 and 2, we will first address her convictions of Counts 4, 5, and 6.

### 1. Counts 4, 5, and 6

{¶ 59} Under R.C. 4511.19(A)(1)(a), "[n]o person shall operate any vehicle . . . if, at the time of the operation. . . [t]he person is under the influence of alcohol[.]" Under R.C. 4511.19(A)(1)(d), "[n]o person shall operate any vehicle . . . if, at the time of the operation. . . [t]he person has a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath." And under R.C. 4510.11(A), "no person whose driver's license . . . has been suspended . . . shall operate any motor vehicle upon the public roads and highways . . . within this state during the period of suspension[.]"

{¶ 60} Kinney does not deny that she was under the influence of alcohol, that her BAC was over .08, or that her driver's license was suspended. The only element of R.C. 4511.19(A)(1)(a), R.C. 4511.19(A)(1)(d), or R.C. 4510.11(A) that she arguably challenges is that she "operated" a vehicle.

{¶ 61} As used in R.C. Chapter 4511, "operate" means "to cause or have caused movement of a vehicle." R.C. 4511.01(HHH). Although R.C. 4511.01(HHH)'s definition of "operate" is not specifically applicable to R.C. Chapter 4510, the Ohio Supreme Court recognized in *State v. Wilson,* 2022-Ohio-3202, ¶ 18, that operation

25.

occurs when a person causes movement of a motor vehicle. Ohio courts applying R.C. 4511.01(HHH) hold that the term "operate" is broad enough to encompass "a person in the vehicle whose conduct causes movement of the vehicle by grabbing the steering wheel." *Columbus v. Freeman,* 2009-Ohio-1046, ¶ 17 (10th Dist.); *State v. Wallace*, 2006-Ohio-2477, ¶ 15 (1st Dist.).

{¶ 62} Here, the State presented evidence that Kinney grabbed the steering wheel, causing movement of the vehicle. Specifically, during her recorded conversation with Kinney, Quinn stated that Kinney grabbed the steering wheel, causing her to lose control of the vehicle ("I know you yanked the steering wheel, and I couldn't control the fucking car. We went over there; we went over there."). Kinney did not deny that she did this. Rather, she apologized and was unable to explain why she did it ("I'm sorry, I'm sorry. Like for real, I don't even."). We find that the State presented evidence that Kinney "operated" the vehicle, and this evidence was sufficient to support Kinney's convictions of Counts 4, 5, and 6. We also find that the jury did not lose its way in resolving this fact in favor of the State.

## 2. Counts 1 and 2

{¶ 63} Under R.C. 2903.06(A)(1)(a), "[n]o person, while operating or participating in the operation of a motor vehicle . . . shall cause the death of another . . . [a]s the proximate result of committing a violation of [R.C.4511.19](A) . . . ." Under R.C. 2903.06(A)(2), "[n]o person, while operating or participating in the operation of a motor vehicle . . . shall cause the death of another . . . [r]ecklessly."

26.

{¶ 64} Kinney argues that her convictions of Counts 1 and 2 were against the sufficiency and weight of the evidence because (1) the jury was improperly instructed that the victim's failure to maintain assured clear distance was not a defense to Kinney's criminal responsibility here; (2) the State incorrectly argued during closing that there was no evidence that B.H. failed to maintain assured clear distance; (3) the State did not show that Kinney was "operating" the vehicle when the accident that caused the victim's death occurred; (4) Kinney did not have control of the headlights and hazard lights; and (5) this case really turned on the discernibility of the disabled vehicle—not its operation—and this is not the conduct that the aggravated vehicular homicide statute was intended to prohibit and punish. Kinney claims that the jury instructions were confusing and inconsistent with the plain language of R.C. 2903.06, counsel ineffectively argued her position, and Quinn's statements were improperly admitted.

{¶ 65} In evaluating the sufficiency of the evidence, we will not consider Quinn's statements to Sergeant Lawson because we agree with Kinney that those statements should not have been admitted. Kinney's challenges to the jury instructions, the quality of trial counsel's performance, and the propriety of certain statements made by the State in its closing argument are the subject of Kinney's third assignment of error and will be addressed in the next section of this decision. We will not consider Kinney's arguments about the purpose of the statute because this is in effect a constitutional argument that the statute is void for vagueness or is overbroad. Kinney did not challenge the constitutionality of the statute in the trial court and we decline to address it for the first

27.

time on appeal. *See State v. Awan*, 22 Ohio St.3d 120 (1986), paragraph one of the syllabus, *limited by In re M.D.*, 38 Ohio St.3d 149 (1988), syllabus. ("Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal."). This leaves us with two issues to address: the meaning of the phrase "while operating," as it is used in R.C. 2903.06(A), and the role of the victim's alleged negligence.

### a. "While Operating"

{¶ 66} Kinney argues that R.C. 2903.06 unambiguously prohibits a person from causing the death of a person "while operating" a motor vehicle, and the State failed to prove that Kinney caused the victim's death "while operating" a motor vehicle. She insists that it is undisputed that she was not "operating" the vehicle at the time it collided with the victim's vehicle, and, in fact, she was not even *in* the vehicle—she was standing on the side of the road. She characterizes the State's position as faulting her only for failing to respond appropriately when the vehicle became disabled by turning on hazard lights or calling 9-1-1. Kinney argues that any proximate causal link between her and the fatal accident "is hopelessly attenuated."

{¶ 67} The State responds that aggravated vehicular homicide under R.C. 2903.06(A)(1)(a) is a strict-liability offense. It relies on *State v. Miranda,* 2014-Ohio-5312 (11th Dist.) in support of its position that Kinney's conduct in causing the car to

28.

become inoperable did not break the chain of causation even though the injury to the victim occurred after operation of the vehicle had ceased. The State insists that the injury that occurred here was a foreseeable consequence of Kinney's actions.

{¶ 68} As to the State's position that R.C. 2903.06(A)(1)(a) is a strict liability offense, this means only that the State need not prove a mens rea—it does not relieve the State of its burden to present sufficient evidence of each element of the offense. In this case, it was required to present evidence that Kinney, while operating or participating in the operation of a motor vehicle, caused the victim's death as a proximate result of committing a violation of R.C. 4511.19(A).

{¶ 69} The trial court instructed the jury that "operate" means "the action of one or more persons to cause or have caused the movement of a vehicle"—the definition provided in R.C. 4511.01(HHH). The court did not define for the jury the meaning of "while operating." Kinney maintains that there was no evidence that she caused B.H.'s death "while operating" a motor vehicle because the vehicle was inoperable at the time of the crash that caused B.H.'s death, and she and Quinn were not in the vehicle at that time. She insists that she "is not accused of actions as a passenger that foreseeably caused a vehicle (driven by a conscious person who did not hit the brakes) to strike a median and become disabled, and that this foreseeably caused the vehicle to lose the ability to have functioning lights, and that this foreseeably caused another driver to not be able to reasonably discern the disabled vehicle and stop." In fact, this is *exactly* what Kinney is

29.

accused of. The State claims that her conduct *while operating* the vehicle set into motion a foreseeable sequence of events that led to B.H.'s death.

{¶ 70} The Eleventh District considered a substantially similar argument in *Miranda,* 2014-Ohio-5312 (11th Dist.). In *Miranda*, the defendant was operating a vehicle while legally intoxicated and struck a guardrail on the expressway. His vehicle spun around, came to a rest in the right lane facing oncoming traffic, and was rendered inoperable. The defendant exited the vehicle. Within minutes, the victim came along and struck the defendant's vehicle, sustaining serious injuries. Like Kinney, the defendant argued that there was no evidence that he caused serious physical harm to the victim "while operating" the vehicle because the vehicle was inoperable, he was not physically in the vehicle, he was not in control of the vehicle at the time of the crash that caused the victim's injuries, and he was not able to move or manipulate the vehicle in any way at the time of the crash that caused the victim's injuries.

{¶ 71} The court explained that the issue of whether the defendant caused the victim's injuries "while operating" a vehicle turned on the meaning of "operating," a term not defined in R.C. Chapter 2903. While the defendant urged the court to interpret "while operating" to require that he was actually operating the vehicle at the time of the collision with the victim, the State urged it to apply the definition of "operate" set forth in R.C. 4511.01(HHH). The State maintained that the defendant caused movement of his vehicle and that movement caused serious physical harm, therefore, the harm was caused "while operating" his vehicle.

30.

{¶ 72} First, the court observed that under R.C. 4511.01(HHH), "operate" "encompasses past or completed movement of a vehicle." *Id.* at ¶ 22. It acknowledged that this definition was meant to apply only to R.C. Chapters 4511 and 4513, however, it found that this definition should be considered in interpretating the aggravated vehicular assault statute because that statute requires that the serious physical harm be proximately caused by a violation of R.C. 4511.19(A), to which R.C. 4511.01(HHH) *does* apply. Second, it found persuasive the fact that OJI's instructions for vehicular assault mimic the definition in R.C. 4511.01(HHH). Third, it noted that Ohio courts have understood the operation of a vehicle to be broader than "mere driving." *Id.* at ¶ 25.

{¶ 73} While the defendant insisted that the tense of the phrase "while operating" did not encompass past conduct, the court found that "while operating" includes "a situation where the harm is caused by a vehicle rendered inoperable as a result of driving while intoxicated." *Id.* at ¶ 21. It concluded that the defendant "operated his motor vehicle so as to render it inoperable on a highway where it was the proximate cause of serious physical injury to another, i.e., he caused the harm while 'hav[ing] caused' the vehicle to move." *Id.* at ¶ 26. It held that "[b]oth the statutory definition of 'operate' and the broader conception of 'operating'" supported the conclusion that "a conviction for Aggravated Vehicular Assault may be sustained where the actual operation of the motor vehicle has ceased but the harm has not yet occurred, provided that no intervening event breaks the chain of causation" *Id.* It found that the fact that the harm occurred "within a

31.

few minutes rather than a few seconds of [the defendant] striking the guardrail [did not] alter the basic criminal character of his conduct." *Id.*

{¶ 74} We agree with the rationale of the Eleventh District.[2] The sequence of events that resulted in B.H.'s death began while Kinney was operating the vehicle. The jury's verdict demonstrates that it found that the sequence of events was foreseeable and was a cause of B.H.'s death. We find that there was sufficient evidence to support Kinney's conviction under R.C. 2903.06(A)(1)(a), and the jury did not lose its way in resolving this issue in favor of the State.[3]

---

[2] The Eleventh District's interpretation does not conflict with the Ohio Supreme Court's decision in *Wilson,* 2022-Ohio-3202, at ¶ 17, where the Court determined that although R.C. 4511.01(HHH) is not facially applicable to R.C. 4510.14, that definition is relevant and makes clear that "operating" a vehicle requires movement. The Court held that "[i]n order for a person whose license is suspended for an OVI offense to be guilty of driving under an OVI suspension, the person . . . must cause or have caused movement of the motor vehicle on the public roads or highways within this state during the period of the suspension." *Id.* at ¶ 19. The Eleventh District's interpretation also does not conflict with *State v. Fork*, 2024-Ohio-1016, where the Court decided which definition of "motor vehicle"—R.C. 4501.01(B) or R.C. 4511.01(B)—applied to the crime of aggravated vehicular assault.

[3] Kinney cites our decision in *State v. Moore,* 2019 Ohio-3705, ¶ 25 (6th Dist.) for the proposition that "a passenger's act, even if it occurred at all, and even if it was the but-for cause of the initial accident, [] cannot be considered a 'substantial factor' in the chain of events leading to the fatality." *Moore* does not stand for this proposition. Paragraph 25 certainly does not stand for this position. As it relates to the passenger's conduct, in ¶ 45-49, this court acknowledged the defendant's claim that the passenger—the deceased victim—tried to choke her while she was driving. We held that despite the passenger's (victim's) conduct, there was nevertheless sufficient evidence to support defendant's conviction of reckless homicide because she was driving while arguing with him, she was angry, she had controlled substances in her system, she may have been speeding, and she lost control of the vehicle.

32.

### b. The Victim's Role in the Accident

**{¶ 75}** Kinney's attorney elicited testimony from Trooper Kiefer that he checked certain boxes on the accident report, indicating that there were circumstances that contributed to the accident, including that B.H. failed to maintain assured clear distance and was distracted while driving. Although Trooper Kiefer explained on redirect that there was no evidence of distracted driving and he always checks "assured clear distance" when there has been a rear-end collision, Kinney argues that the chain of causation was broken here when B.H. failed to maintain clear distance and struck the stationary, unoccupied vehicle. Although she eventually acknowledges that this rule may be limited to civil cases and may not apply to criminal cases—*see State v. Neale,* 2012-Ohio-2530, ¶ 67-68 (5th Dist.) (explaining that civil instructions concerning independent intervening causes and natural consequences are not applicable in a criminal proceeding for vehicular homicide)—she submits that the assured clear distance statute virtually always places fault on the driver of the vehicle that strikes the stationary object unless the object was not reasonably discernible. Kinney maintains that the sole cause of the accident here was B.H.'s failure to maintain assured clear distance.

**{¶ 76}** The State responds that the conduct of the victim will relieve Kinney of criminal responsibility only if it was the *sole* cause of her death, and here, it wasn't. It maintains that the evidence—particularly P.M.'s testimony—showed that the victim "had no realistic ability to stop given the placement of Quinn and Kinney's abandoned car."

33.

**{¶ 77}** The court instructed the jury that "[t]here may be one or more causes of an event. However, if a defendant's act was one cause, then the existence of other causes is not a defense." It explained, "[a] Defendant is responsible for the natural consequences of that Defendant's unlawful act, even though death was also caused by an intervening act or failure to act of another person."

**{¶ 78}** "As a matter of law, there may be more than one proximate cause of an injury." *State v. Dunham*, 2014-Ohio-1042, ¶ 48 (5th Dist.), citing *Taylor v. Webster,* 12 Ohio St.2d 53 (1967) and *Strother v. Hutchinson,* 67 Ohio St.2d 282 (1981). "[O]ne can 'cause' an event through contributing to the chain of events." *State v. Motley*, 2023-Ohio-1811, ¶ 26 (8th Dist.). The contributory negligence of the decedent is not a defense to vehicular homicide, "unless it is the sole proximate cause of the accident." (Multiple citations omitted.) *Dunham* at ¶ 50. "As long as the state prove[s] beyond a reasonable doubt that [defendant's] actions were a cause of death, it is irrelevant whether there were any other contributory causes." *Id.* at ¶ 51.

**{¶ 79}** The State presented evidence that while intoxicated, Kinney grabbed the steering wheel of a vehicle that was traveling 83 miles per hour on the expressway, Quinn—who Kinney knew had been drinking—failed to regain control of the vehicle and struck a concrete barrier, the vehicle was disabled in a lane of travel in a dimly-lit area with no headlights or hazard lights, and the vehicle was simply not visible until it was too late. This evidence was sufficient to prove that Kinney's conduct was *a* cause of the

34.

accident that caused B.H.'s death, and the jury's verdict makes clear that it agreed with the State's theory of the case.

{¶ 80} We find that there was sufficient evidence to support Kinney's conviction under R.C. 2903.06(A)(1)(a), and the jury did not lose its way in resolving this issue in favor of the State.

{¶ 81} As to Count 2, the State argues that if we find that Kinney's conviction of Count 1 is supported by the weight and sufficiency of the evidence, we need not address these arguments with respect to Count 2 because any error would be harmless. We agree that we need not review the sufficiency and weight of the evidence in support of Count 2, but not for the reason urged by the State. Rather, we reach this conclusion because there has not been a "conviction" of Count 2.

{¶ 82} As Judge Zmuda explained in his dissenting opinion in *State v. Horn,* 2023-Ohio-138 (6th Dist.), the Ohio Supreme Court, in *State v. Whitfield,* 2010-Ohio-2, held that a "conviction" includes both a guilty verdict and a sentence. *Horn* at ¶ 62 (Zmuda, J., dissenting), citing *Whitfield* at ¶ 12. Therefore, if a guilty verdict is merged with another count for purposes of sentencing pursuant to R.C. 2941.25, that guilty verdict remains unsentenced and does not constitute a "conviction" subject to appellate review. *Id.,* citing *State v. Worley,* 2016-Ohio-2722, ¶ 23 (8th Dist.). Put simply, in cases where separate counts are merged and the state elects the count on which the trial court will impose sentence, only the count that includes both a guilty verdict and sentence is subject

35.

to this court's review.  *Id.*  As such, we need not examine the sufficiency and weight of the evidence in support of Count 2.

{¶ 83} We find Kinney's second assignment of error not well-taken.

### C.  Ineffective Assistance of Counsel

{¶ 84} In her third assignment of error, Kinney maintains that trial counsel should have requested a jury instruction that a sole intervening event breaks the chain of causation in criminal cases.  She maintains that trial counsel should have objected to hearsay statements that were introduced through admission of body camera footage, allegedly-incorrect statements made by the State during closing arguments, and references to Quinn's statements to Sergeant Lawson.  And she argues that trial counsel should have questioned time jumps in the recordings from the body cameras.

{¶ 85} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result.  *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995).  To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."  *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  "A

36.

reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 86} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 87} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 2005-Ohio-3775, ¶ 8 (11th Dist.), quoting *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160 (4th Dist. 1988).

### 1. Jury Instructions

{¶ 88} Kinney complains that the jury should have been instructed that it is a defense to aggravated vehicular homicide that someone other than the defendant was solely at fault for the accident. She argues that in the usual case, where the defendant is

37.

actively operating the vehicle at the time of the crash, there is unlikely to be a sole, intervening cause. But, she claims, where, as here, the defendant was not in the vehicle, *how* the vehicle came to be stationary "has nothing, literally nothing, to do with how the tragic accident occurred[.]" The State responds that the jury instructions were taken straight from OJI and were proper, and any potential error was harmless because there was substantial evidence of Kinney's guilt.

{¶ 89} "Juries are entitled to 'all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. Wilson*, 2024-Ohio-776, ¶ 28, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Generally, the failure to request a particular jury instruction is considered a matter of trial strategy that will not support a claim of ineffective assistance of counsel. *Clayton* at 47.

{¶ 90} As we explained in the preceding section, "while driving" is broad enough to encompass Kinney's conduct here. To that end, the cause for the vehicle becoming stationary on the expressway in the lane of travel was highly relevant. Here, the State presented evidence that Kinney's conduct, at the very least, was *a* cause of the accident that resulted in B.H.'s death. The court's instructions to the jury— "if a defendant's act was one cause, then the existence of other causes is not a defense," and "[a] Defendant is responsible for the natural consequences of that Defendant's unlawful act, even though death was also caused by an intervening act or failure to act of another person"—were correct statements of the law, and trial counsel did not err in failing to ask for additional

38.

instructions. *See Neale,* 2012-Ohio-2530, at ¶ 67-68 (5th Dist.) (finding that trial court did not err in refusing to give civil jury instructions suggesting that defendant—who was intoxicated and speeding—could be relieved of criminal liability if the victim had run red light).

## 2. Objections

{¶ 91} Kinney complains that trial counsel was ineffective for failing to object to (1) the State's references to Quinn's statements to Sergeant Lawson, (2) the State's contention during closing argument that there was no evidence that B.H. failed to maintain assured clear distance, and (3) admission of hearsay statements contained within the body camera footage that was admitted as evidence and played for the jury.

{¶ 92} As to Quinn's statements to Sergeant Lawson, we have already determined that the admission of those statements was harmless error, thus there was not a reasonable probability that the outcome of the proceedings would have been different had trial counsel objected to those statements.

{¶ 93} As to the State's statement during closing that there was no testimony that B.H. failed to maintain assured clear distance, courts often deem it trial strategy whether to object to improper statements during closing arguments. *See State v. Herns*, 2023-Ohio-4714, ¶ 85 (7th Dist.), citing *State v. Mundt*, 2007-Ohio-4836, ¶ 90 ("A failure to object during closing arguments is frequently part of trial strategy."). In any event, while the State's attorney did remark that "[t]here was no testimony that [B.H.] didn't keep assured clear distance," he also stated, "[s]o when you think about assured clear distance,

39.

the testimony of the officers was, look, that's just a box we check any time there's a rear end collision. Regardless of the context in the case, we check number eight in that box. That doesn't mean we've made some finding of fault because it doesn't take into account the condition of that dark vehicle." Taken as a whole, we do not find that the State's characterization of the evidence was inaccurate, and even if it was not entirely accurate, (1) trial counsel could reasonably have chosen not to object to the statement as a strategy decision, and (2) there was no reasonable probability of a different outcome had trial counsel lodged an objection.

{¶ 94} Concerning admission of the body camera recordings, Kinney complains that the jury was provided seven hours of recordings, and those recordings included conversations between the officers and hearsay statements from a third-party witness. Kinney claims that trial counsel should have objected to their admission. The State denies that the jury watched seven hours of body camera footage—only 45 minutes of footage was played at trial and the jury deliberated for less than three-and-a-half hours. It also contends that if Kinney's attorney had lodged a hearsay objection, it would have merely called another trooper to the stand, thereby adding to the testimony that the defendants were drunk. The State insists that no prejudice resulted to Kinney.

{¶ 95} As to the statements from the third-party witness, P.M. testified at trial and his testimony was consistent with the statements made in the recording. His statement in the recording was, therefore, cumulative, and we find that there is no reasonable probability that the outcome of the proceedings would have been different had his

40.

recorded statement been excluded from evidence. As for the conversations between the officers, we have watched those recordings. Aside from conversations with or between the defendants and the statement from P.M., there is a lot of silence as the officers perform ministerial tasks at the scene of the accident. To the extent that officers talk with each other, most of those conversations pertained to trying to understand how the accident occurred, repeating the version of events provided by Quinn and Kinney, and trying to reconcile that version of events with the findings at the scene. The State correctly observes that it is unlikely that the jury watched all of the recordings (unless they did so at an increased speed), and even if they did, we cannot say that there is a reasonable probability that the outcome of the proceedings would have been different had they not viewed the recordings of the officers' conversations.

{¶ 96} Finally, concerning jumps in the recordings, Kinney claims that there were approximately five minutes of footage missing and trial counsel failed to question this. Even if this is true—that the footage was "missing" and trial counsel did not know or question the reason—Kinney concedes that "we have no idea what the rest of the conversation was about, nor what either of the defendants said." As such, we cannot say that the contents of the allegedly-missing minutes of recording would have been helpful to Kinney's defense, thus Kinney has failed to establish a reasonable probability of a different outcome.

{¶ 97} Accordingly, we find Kinney's third assignment of error not well-taken.

41.

### III. Conclusion

{¶ 98} Kinney's co-defendant's inculpatory statements should not have been admitted into evidence because she was not subject to cross-examination, but the error in admitting those statements was harmless because the evidence was cumulative to properly-admitted evidence. We find Kinney's first assignment of error not well-taken.

{¶ 99} Kinney's conviction under R.C. 2903.06(A)(1)(a) was supported by the sufficiency and weight of the evidence. The sequence of events that resulted in B.H.'s death began while Kinney was operating the vehicle and was a result of her operation of the vehicle. Moreover, B.H.'s alleged failure to maintain assured clear distance did not break the chain of causation because Kinney's conduct was *a* cause of the accident that led to B.H.'s death. We find Kinney's second assignment of error not well-taken.

{¶ 100} Trial counsel's failure to seek additional jury instructions and to lodge objections to Quinn's statements, statements by the prosecutor during closing argument, and admission of hearsay statements contained in recordings from body cameras, did not constitute ineffective assistance of counsel. The jury instructions were appropriate, the failure to object at closing was a strategic decision, and Kinney failed to establish that there was a reasonable probability of a different outcome. We find Kinney's third assignment of error not well-taken.

42.

**{¶ 101}** We affirm the January 29, 2024 judgment of the Wood County Court of Common Pleas. Kinney is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.           _____
JUDGE

Gene A. Zmuda, J.          

_____
Myron C. Duhart, J.           JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.